ST. PAUL FIRE & MARINE INS. CO. v.
PURE OIL CO.

UNITED STATES MERCHANTS' & SHIP-
PERS' INS. CO. v. SAME.
Nos. 222, 223.

Circuit Court of Appeals, Second Circuit.
March 13, 1933.

Kirlin, Campbell, Hickox, Keating & Mc-
Grann, of New York City (Delbert M. Tib-
betts and Richard L. Sullivan, both of New
York City, of counsel), for appellants.

Hatch & Wolfe, of New York City (Car-
ver W. Wolfe, of New York City, of coun-
sel), for appellee.

Before L. HAND, SWAN, and AU-
GUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This appeal arises in two consolidated
actions to recover money paid under a mistake
of fact. The plaintiffs are marine underwrit-
ers which had insured a cargo of oil aboard a
lighter at Sinco, Texas, bound for a steamer
in the harbor. Another steamer collided with
and sank the lighter, and the oil was lost;
for it the plaintiffs in May, 1922, settled with
the defendant at $2.75 a barrel. Being subro-
gated to its cause of action against the steam-
er, they brought a suit in the admiralty, and
succeeded on the merits. In settling the dam-
ages they were unable to find evidence of the
value of the oil at more than $2.19, which they
were forced to accept by way of compromise.
They thereafter sued the defendant for the

difference, on the theory that the settlement at $2.75 a barrel had been made under a mutual mistake of both parties. At the close of the evidence both sides moved for a verdict, which the judge directed for the defendant.

■ The plaintiffs had issued separate policies to the defendant, the only material part of which was as follows: "Valued, premium included, at sales price port of destination on date of sailing." The destination of the oil was Marcus Hook, Philadelphia, the date of sailing, December 14, 1921. Curtin & Brockie were insurance brokers and agents for the plaintiffs; they had issued the policies, which were approved by the home offices on November twenty-ninth and December fourteenth; neither party contends that the second policy was not in force when the loss occurred. On December 12, 1921, the defendant reported the proposed shipment to Curtin & Brockie, who made out two "provisional applications," one for each assurer. These contained the words, "valued at $2.75 per bbl. as per O. P." (open policy). Curtin & Brockie initialled these and sent them to the respective offices of the plaintiffs, and on February 20, 1922, issued and delivered to the defendant two "certificates of insurance," signed by the underwriters. One of these reads as follows: "This company insured The Pure Oil Company under and subject to the conditions of open policy No. 24817 in the sum of $107,729. on ½ interest on 78,348.-36 bbls. Mexia crude oil Valued at $215,458. ($2.75 per bbl. vessel lost or not lost)"; the other was in substance the same. At the time when the two certificates were issued, the plaintiffs had learned of the loss and had received from the defendant a claim and an invoice of the cargo representing its value as $2.75. Later, but before paying the loss in May, 1922, Curtin & Brockie received from the defendant detailed information as to how the figure was reached; it was on the base of $1.60 as the price of crude oil in the Mexia field from which the cargo had come. On the trial the only evidence of the price of crude oil in the Mexia field was a small contract at $1.25 early in November, and the "posted" field price of two large companies. This "posted" price was that on which the companies settled with the lessors of wells they operated, and which they used in intercompany accounts. It had been seventy-five cents until December fifteenth, when it went up to one dollar, where it stayed for the balance of the month. The defendant had apparently fixed its price from a large contract at $1.50, which it had raised to $1.60 because it thought that oil was rising in value. But it made no proof as to value, and the contract cannot be considered.

■ Had the certificates been issued before the loss, and perhaps before knowledge of it, we may assume that the coverage would have been of a "valued risk." Though the mere statement of the amount of insurance does not create a valued policy, the phrase, "valued at," is the usual form for stipulating damages in advance. Snowden v. Guion, 101 N. Y. 458, 5 N. E. 322; cf. Williams v. Continental Ins. Co. (D. C.) 24 F. 767. Whether such a policy could be reformed for mutual mistake, or payment recovered, may depend upon what was intended. We might for example agree that if the parties had fixed the value by the list of quotations of a produce exchange, and it could be shown that they used one of a different date, the contract would not hold. That would be because they really have meant to take that publication as authoritative, and not the market price as ascertained from any other source. It does not follow that it is enough for an underwriter merely to show a disparity between the insurance and what the court may find to be the market price; such agreements are meant to be conclusive. It is exactly to preclude inquiries into the issue, that the parties take out valued insurance at all; they mean to substitute their present assessment for the result of later controversy. In the absence of fraud this is as conclusive as in the case of any other damages; and indeed valued insurance is only an instance of stipulated damages. Empire Dev. Co. v. Title G. & T. Co., 225 N. Y. 53, 58, 121 N. E. 468. Therefore, if the certificates had measured the underwriters' obligations, we may say arguendo that they would have fixed them at $2.75. In any case it is plain that the provisions of the policy could not prevail. These did not conflict with the certificate; "sales price at destination on date of sailing" might be $2.75 a barrel. The certificates were apparently an effort to fix the meaning of that clause by subsequent contract, on which indeed the premium was adjusted. Phœnix Ins. Co. v. De Monchy, 18 Asp. M. Rep. N. S. 7.

■ But the certificates were issued after the losses were known to both parties, and a claim had been made, and thus at a time when they could not affect the parties' rights except as an accord, to which the later payment might be a satisfaction. Ins. Co. of N. A. v. Willey, 212 Mass. 75, 98 N. E. 677; Harman v. Kingston, 3 Camp. 150; J. Aron & Co. v. U. S. Lloyds (D. C.) 275 F. 443. N. Y. & Oriental

S. S. Co. v. Auto Ins. Co., 37 F.(2d) 461 (C. C. A. 2), does not hold the contrary, though it is true that the case might have been disposed of on the ground we take. Apparently the point was not raised; as it was not in Phœnix Ins. Co. v. De Monchy, supra. Nor were the "provisional applications" intended as "binders" pro tempore. "Binders" are documents delivered to the assured before any policy is issued, intended to stand in its place until it can be made out. These applications, as their name implies, were no more than requests by the assured for a certificate. No counterfoil was delivered to it, and the transaction remained in fieri until the certificates were issued. Nor can the certificates be treated as an accord, a settlement of the risk. They may indeed have been intended as a declaration or even a promise that the loss would be treated as "valued," but as promises they were without consideration, the loss being already known. They were nudum pactum. It can certainly make no difference in the obligation to pay an amount not due, that the person paying has said in advance that he would pay it. Since therefore the underwriters were liable only for sales price at destination, and since both sides fixed this with the field price as a base, they were under a mutual mistake of fact which was material, if it actuated the payment.

That it did so actuate it, is clear unless it appeared that the plaintiffs supposed themselves bound to pay $2.75 a barrel. There would be no reason to believe so, except for the issuance of the certificates. These were in form a promise to pay, as we have said; as contracts we may assume that a unilateral mistake as to the plaintiffs' duty to issue them would not excuse performance. But whether the payment was due to the plaintiffs' belief that they were under a duty to treat the loss as valued, is a question of fact. The evidence does not justify the conclusion that the plaintiffs paid for that reason; on the contrary, it appears without contradiction that those who settled the loss, did so on the notion that it was an "open" policy, that $1.60 was the field price, and that that price was the nearest way to ascertain the sales price at destination, which was that which alone bound them. This was very natural, since it was extremely improbable that they should have considered themselves bound by such a certificate, issued after the loss was known to be fixed. Even if they had paid because they thought the certificates compelled them to do so, they would still have been mistaken, but perhaps that would have been a mistake of law and we should be faced with that most

unfortunate doctrine. But as the record stands there is no reason to suppose that this was the motive of the payment.

The evidence that the market price at Mexia was less than $1.60 on December 14, 1921, is extremely scanty; the "posted" prices are certainly not controlling. However, no objection was raised to the testimony except that the only proper measure was the price at Marcus Hook, which was not sufficient. At the end of the case the defendant moved generally for a verdict, without at any time suggesting that the evidence as to the price was not enough. The judge found that the price was not more than one dollar, and the defendant does not question the finding. It seems to us that the "posted" prices were admissible, when coupled with proof that there were no sales. The issue of value was at best hard of proof; it is usually better to allow some latitude even at the risk of error than to turn away a suitor with empty hands. Upon another trial the issue may come up in very different form, but upon this one we should have accepted any estimate within measurable limits. The premium must of course be deducted, but as this is an action for money paid, no tender before suit was necessary.

Judgment reversed; new trial ordered.