**PUROFIED DOWN PRODUCTS CORP., Plaintiff,**

v.

**TRAVELERS FIRE INSURANCE COMPANY, Defendant.**

United States District Court
S. D. New York.
April 29, 1959.

See, also, 171 F.Supp. 399.

Irving L. Spanier, New York City, for Plaintiff. Norman D. Levy, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendant. Vincent L. Leibell, Jr., New York City, of counsel.

LEVET, District Judge.

This is an action by an insured for a loss under a marine open cargo policy of insurance. Prior to the commencement of this action the defendant paid to the plaintiff $52,000 which was the invoice amount of the shipment here at issue. Plaintiff seeks in this action to recover the cost of freight plus an additional 10% allegedly due as a result of said loss.

After hearing the testimony, examining the exhibits, the pleadings, briefs and proposed findings, this court makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. The plaintiff, Purofied Down Products Corp., is a corporation duly organized and existing under the laws of the State of New York, with its office in the City of New York.

2. The defendant, The Travelers Fire Insurance Company (sometimes also referred to as the "insurance company") is a corporation duly organized and existing under the laws of the State of Connecticut and authorized to carry on the business of fire insurance in the State of New York.

3. Plaintiff is in the business of importing feathers and downs and processing them for use and manufacture of pillows, comforters and sleeping bags.

4. On or about November 28, 1949, the defendant made and issued to the plaintiff through plaintiff's broker, Buhler Service Corporation (hereinafter called "Buhler"), defendant's open marine policy No. MOC 1208. (See Exhibit 1, which is the contract produced by plaintiff)

5. Paragraph 16 of Policy No. MOC 1208 provided that the policy was deemed continuous and to cover and attach on all goods shipped on and after November 28, 1949, and was to continue in full force thereafter until cancelled by either party giving the other 30 days' written notice, such cancellation, however,

not to prejudice any risk in transit at the termination of that period.

6. Policy MOC 1208 contained an endorsement effective as of February 13, 1951, whereby the defendant's limits of liability under the policy were increased to not more than $200,000 for loss on any one vessel or conveyance or in any one place at any one time, but in respect to shipments on deck the defendant's liability was increased to not more than $20,000 for goods so carried on deck of any one vessel. (Exhibit 1)

7. Policy MOC 1208 was not cancelled by either party at any time between November 28, 1949 and July 18, 1952. (See pleadings)

8. Policy MOC 1208 set forth, among other things, that the defendant agreed to insure plaintiff against loss by fire of plaintiff's goods and merchandise, consisting principally of feathers in compressed bales, which were being transported by boat from European countries, excluding Russia, to United States Atlantic ports north of Cape Hatteras.

9. Paragraph 7 of said Policy No. MOC 1208 was as follows:

"Valued premium included, at amount of invoice including all charges therein, plus any prepaid and/or advanced and/or guaranteed freight not included in the invoice, plus 10%, foreign currency to be converted into dollars at bankers' sight rate of exchange applicable to each invoice and/or credit and/or draft."

10. Paragraph 26 of said policy was as follows:

"(A) It is a condition of the liability of this Company that all risks hereunder be reported as soon as known to the Assured and amounts declared as soon as ascertained; and should the Assured fail to report risks covered hereby, then this Policy as to all subsequent risks, shall become null and void if this Company shall so elect;

"(B) The Company is entitled to premiums, at rates of this Company, on all risks covered herein whether reported or not;

"(C) This Company shall have the privilege, at any time during business hours, to inspect the records of the Assured as respects shipments coming within the terms of this Policy."

11. Paragraph 27 of said policy was as follows:

"It is a condition of this Policy, and it is hereby agreed, that the Assured's brokers, Buhler Service Corp. or any substituted brokers, shall be deemed to be exclusively the agents of the Assured and not of this Company in any and all matters relating to, connected with or affecting this insurance. Any notice given or mailed by or on behalf of this Company to the said brokers in connection with or affecting this insurance, or its cancellation, shall be deemed to have been delivered to the Assured."

12. Policy No. MOC 1208 provided that the rates of insurance per $100 for shipments carried below ship deck from Holland, Belgium and France to United States ports north of Cape Hatteras was .125. Said rates related to shipments of feathers in compressed bales while being transported in metal steamers full powered motor vessels of Class A lines per the defendant's specifications. (Exhibit 1)

13. The original and one copy of the policy were delivered by the defendant to plaintiff's agent, Buhler. Buhler sent the original to the plaintiff. This original was produced at the trial by the plaintiff. (Exhibit 1)

14. On or about January 15, 1952, defendant sent a letter to Buhler, which Buhler received on or about said date, enclosing an endorsement effective as to all shipments after February 15, 1952, to be incorporated in the open marine policy MOC 1208, heretofore referred to. (See Exhibit J)

15. Upon receipt from the defendant of said letter of January 15, 1952 (Exhibit J), Buhler sent plaintiff a letter dated January 21, 1952, enclosing the endorsement received from the defendant. (Exhibit J–1)

16. The endorsement Buhler received from the defendant, as aforesaid, reads in part as follows:

"Effective as to all shipments made on and after February 15, 1952 this Policy is amended as follows:

\* \* \* \* \* \*

"No suit or action for recovery of any claim arising under this Policy shall be sustainable in any court unless such suit or action shall have been commenced within 12 months next after notice to the consignee of the arrival of the shipment." (See Exhibit I)

17. During the period of this policy the plaintiff customarily filled out declarations and mailed them to Buhler, who had instructed plaintiff how to fill them out. The forms came through Buhler's office, although they were supplied by the defendant.

18. Buhler would receive a provisional declaration from the plaintiff which would indicate the date of sailing, the name of the steamer and, as it was called in the trade, the "provisional amount." Buhler would make a copy of the declaration for its files and transmit the original to the defendant. Later on, after arrival of the steamship in port, the plaintiff would send Buhler a final declaration indicating the exact amount of the invoice value. This, in turn, would be forwarded to the defendant. As a rule, Buhler made no notation on the declaration.

19. The customary procedure by plaintiff during the period in which the policy was in effect was to declare invoice value only on its declarations and not to include freight even though freight may have been paid.

20. The M/S Black Gull was, in the year 1952, at the time it commenced each and every voyage from Antwerp to New York, a metal steamer, full powered motor vessel of a Class A line, in accordance with the terms of defendant's policy No. MOC 1208. (See Stipulation of April 9, 1959)

21. In June or early July, 1952, the plaintiff purchased 4,000 kilos of feathers in Europe from one H. R. Bohner, invoiced at $52,000.

22. On or about July 5, 1952, at the Port of Antwerp, a shipment of 50 bales of Duvets (down), having a gross weight of 4,125 kilos and a net weight of 4,000 kilos, was delivered to the Black Diamond Steamship Corp. by S. A. Dumanex as agents for the seller, H. R. Bohner, for consignment to the plaintiff, as purchaser, at 1027 Metropolitan Avenue, Brooklyn, New York. (See Exhibit 2)

23. The steamship agent thereupon issued a clean bill of lading for 50 bales "in apparent good order and condition" and "said to contain" Duvets. The carrier did not examine the contents.

24. Forty-Seven of the bales were placed in the hold of the vessel and three were placed in the No. 2 'tween deck.

25. On July 18, 1952, while en route to the Port of New York from the Port of Antwerp, the M/S Black Gull caught fire off Montauk Point, U.S.A., and the cargo of 50 bales of Duvets (down), property of the plaintiff, was totally destroyed.

26. The plaintiff received from the carrier a form entitled, "Arrival Notice and Freight Bill," on which the Expected Arrival date was stated to be July 19, 1952. (Exhibit 6) This notice was received by the plaintiff, presumably on or before July 18, 1952. The freight bill for $680.63 was paid. The plaintiff did not receive the shipment of 50 bales. From all the circumstances herein, it appears, and I so find, that both the plaintiff and the defendant knew of the loss on or before July 22, 1952. On or about July 22, 1952, Willard C. Johnson, then an underwriter for Buhler, received a written notice from the plaintiff with

respect to the loss of the cargo aboard the M/S Black Gull. Johnson then turned this over to Buhler's claim department for prosecution.

27. On or about July 23, 1952, plaintiff was formally notified in writing by the carrier that the shipment had been destroyed. (Exhibit 4)

28. A formal notice of claim dated July 22, 1952, was forwarded by Buhler to the defendant and received by defendant on July 23, 1952. This claim contained the following statement under "Remarks":

"*Remarks* This Notice of Claim will confirm our Mr. Johnson's telephone call to you on July 21, 1952 reporting that approximately $52,-000 worth of the insured's merchandise was totally destroyed as a result of the Black Gull's burning off Montauk Point on the above date. Approximately $680.63 in preliminary shipping charges are also involved. Kindly acknowledge receipt of this Notice and favor us with your advices as to what steps we must take to bring this claim to a speedy settlement." (Exhibit 12)

The form as typed in contained no statement after the printed word, "Amount."

29. A declaration dated July 25, 1952, was sent on behalf of the plaintiff by Buhler to the defendant and was received by the defendant and stamped "Received" by defendant on July 28, 1952. This declaration mentions $52,000 and the premium under both marine and war insurance. No mention of freight or an additional 10% appears; the premium stated therein is based on $52,000. (See Exhibit 9)

30. On or about August 25, 1952, the defendant delivered to Buhler a check in the amount of $52,000 payable to the plaintiff. (Exhibit 13) This check states that it is for a fire loss, refers to a claim number, date of loss and policy number. No letter appears to have accompanied this check.

31. At the time Buhler received said check, Harold R. Tullman, its claims manager, directed Johnson of Buhler to see what he could do about getting the additional amount of $680.63 in freight and an additional 10%.

32. In the meantime, Tullman caused said check to be delivered by hand to the plaintiff together with a letter dated August 28, 1952 (Exhibit B), in which he asserted that the check or draft of $52,000 is "in full and final payment of your Ocean Marine loss" of July 18, 1952, and further stated: "In that connection we call your attention to the fact that the declaration you filed with the Insurance Carrier indicated that the full valuation was $52,000. The latter amount was, therefore, the maximum amount of coverage you purchased." This letter and the said check were concededly received by the plaintiff.

33. By letter dated September 17, 1952, addressed to Mr. Henri Esquerre of the defendant, Johnson of Buhler submitted certain data in connection with plaintiff's "claim for the payment of 10% of the Invoice Value plus freight charges in addition to the payment of the $52,-000 already made herein * * *." (Exhibit 7)

34. Defendant's reply of September 19, 1952 to Buhler reads in part as follows:

"Yours of September 17th to me under caption has been received. I can't imagine what possessed your office to write it. If I made anything clear, I thought I made it perfectly clear the assured's case, as submitted by you as being the result of honest error, is to be considered on principle alone * * *."

" * * * The steps I am taking in connection with this matter is to submit the case in the manner agreed to the Head Office. After hearing from them, I will report back to you. * * *" (Exhibit A)

35. The defendant's check for $52,-000 was deposited by the plaintiff on or about September 22, 1952. (Exhibit 13)

36. A letter from Esquerre of the defendant to Buhler dated October 1, 1952, reads in part as follows:

"We have submitted case for additional payment under captioned loss to our Home Office in the manner requested. We have also discussed it carefully and thoroughly with them, keeping fully in mind at all times both the assured's position and responsibility in the matter as well as our own to them. Our conclusion is that payment beyond the amount of insurance declared is neither covered nor should be made." (Exhibit G)

37. Further negotiations with the defendant were initiated by Buhler, the defendant always stating in effect: "No further settlement."

38. Buhler offered the insurance company various "business propositions" in an effort to affect a settlement, but to no effect. On one occasion, Mr. Tullman asked permission to contact defendant's home office in Hartford directly and was told by one Mr. Bolton of the defendant: "We already took it up with Hartford, and Hartford says no."

39. Prior to July 14, 1955, a meeting took place between Johnson of Buhler and Esquerre of the defendant in which the latter reiterated his company's previous decision and refused to reopen the case for further negotiations.

40. Prior to the commencement of this action, plaintiff offered to pay to the defendant $7.44 as an additional premium due on policy MOC 1208 by reason of said shipment of Duvets (down) on the M/S Black Gull. The defendant rejected this offer.

41. This action was commenced by service of a summons on the defendant on July 14, 1955 in an action in the City Court of the City of New York, County of New York. The case was removed to this court by petition filed August 19, 1955.

### Discussion

Three defenses are urged by the insurance company as bars to plaintiff's recovery in this action. These are in substance as follows:

1. That plaintiff is not entitled to recover for freight and an additional 10% of the value of the shipment since it reported only the invoice amount of $52,000 in its final declaration. (Exhibit 9)

2. That defendant's check for $52,000 (Exhibit 13), received and deposited by the plaintiff, constituted an accord and satisfaction of plaintiff's claim.

3. That plaintiff's claim is time-barred by reason of the one-year contractual period of limitation contained in the February 15, 1952 endorsement to the policy. (See Exhibit I)

For the reasons hereinafter stated, I have concluded that none of the the defenses urged herein constitute a basis for defeating plaintiff's claim.

Paragraph 7 of policy MOC 1208 provided for the payment of premiums based upon the invoice amount of the shipment plus freight thereon not included in the invoice plus 10%. Premiums were payable upon each $100 of coverage at the rates specified in the rate schedule attached to the policy. (Exhibit 1) Under Paragraph 26(B) of the said policy, the defendant was entitled to premiums at the rates specified "on all risks covered herein whether reported or not." Paragraph 26(C) authorized the defendant to inspect the plaintiff's records as respects shipments coming within the terms of the policy.

Thus, as to any shipment covered by said policy, the defendant had an absolute right to receive and the plaintiff an absolute obligation to pay premiums at specified rates per $100 of insurance, based not only upon the invoice amount but also upon freight plus 10%. Nevertheless, the defendant seeks to disclaim liability for freight plus 10% on the shipment here at issue allegedly since the plaintiff in its final declaration reported only the $52,000 invoice amount of the shipment.

Paragraph 26(A) of the policy on which the defendant relies required the plaintiff to report all risks as soon as

478

known and "the amounts declared" as soon as ascertained. What amounts were to be declared is not specified, nor did the declaration forms (Exhibit 9), supplied by the defendant for this purpose, make the matter any clearer.

On July 23, 1952, five days after the occurrence of the loss and five days prior to the defendant's receipt of plaintiff's final declaration, defendant received a notice of loss from Buhler reporting the total destruction of "approximately $52,-000 worth of the insured's merchandise" and further advising the defendant that "Approximately $680.63 in preliminary shipping charges are also involved." Thus it appears that when the defendant received the plaintiff's final declaration on July 28, 1952, it already knew that the valuation contained therein did not include freight and 10% above the invoice amount.

Paragraph 26(A) did not expressly limit recovery under the policy to the amount stated in the final declaration and, in my opinion, no such limitation can be implied where, as here, the final declaration was filled out and received by the defendant after the occurrence of the loss and after receipt by it of plaintiff's notice of claim which indicated the true extent of the loss. See St. Paul Fire & Marine Ins. Co. v. Pure Oil Co., 2 Cir., 1933, 63 F.2d 771, 772.

██ As to defendant's claim of accord and satisfaction:

The defendant has failed to establish by a fair preponderance of the evidence that in submitting its check for $52,000 to the plaintiff or to Buhler, it either intended or indicated that said check constituted full payment of plaintiff's entire claim to the extent of the freight charge and the additional 10%.

Defendant's check contained no indication that it was to constitute payment in full, nor was there a covering letter to that effect. Whatever may have been Buhler's motive for sending to plaintiff its letter dated August 28, 1952 (Exhibit B) in the verbiage utilized, I do not believe that said letter constituted a trans-

mission of any offer of compromise by the defendant in regard to plaintiff's claim for freight plus 10%. It was at most Buhler's subjective opinion.

Thus, Johnson of Buhler, on cross-examination, testified in part as follows:

"Q. Didn't Buhler Service Corporation know at the time it received the check for $52,000 that that was all the money that Travelers Fire Insurance Company would pay on this claim? A. We had no way of knowing what the intent of the Travelers was, sir."

The letter of September 17, 1952, written by Buhler to the defendant (Exhibit 7), indicates that defendant's check was not regarded as a settlement of plaintiff's claim for these items. The position taken by the defendant in its reply letter of September 19, 1952 (Exhibit A) was in effect that plaintiff had no right of action for the additional amounts claimed rather than asserting that these claims had been compromised. Defendant's letter of October 1, 1952 (Exhibit G), sent to Buhler after the $52,000 check had been deposited by plaintiff, makes defendant's position in this regard even clearer.

Thus it appears that both parties to this action viewed the $52,000 check as full payment of that portion of the claim which was concededly due, namely the invoice value of the shipment, and that neither party considered the check as an accord and satisfaction with respect to the additional amount of freight and 10%, which plaintiff's agent, Buhler, repeatedly sought to collect.

The question of whether an accord and statisfaction has been agreed upon and consummated is one of fact. See Hudson v. Yonkers Fruit Company, 1932, 258 N.Y. 168, 179 N.E. 373, 80 A.L.R. 1052; Japan Cotton Trading Co. v. Farber, 1st Dept., 1931, 233 App.Div. 354, 253 N.Y.S. 290. Since I am here forced to conclude that the minds of the parties did not in fact come to an agreement constituting an accord and satisfaction, this defense must be overruled.

■■ As to the contention that plaintiff's claim is time-barred:

Buhler, plaintiff's agent, as heretofore indicated, received notice of the contractual limitation. The time bar provision asserted as a defense in this action reads as follows:

"No suit or action for recovery of any claim arising under this Policy shall be sustainable in any court unless such suit or action shall have been commenced within 12 months next after notice to the consignee of the arrival of the shipment."

The defendant in effect asserts that a notice of arrival was received by the plaintiff on or about July 17, or 18, 1952. The form of this notice is entitled as printed, "Arrival Notice and Freight Bill." On this is stamped "Expected Arrival July 19, 1952." (Exhibit 6) No other notice or purported notice of arrival was sent. The goods admittedly were destroyed in toto on July 18, 1952, and never arrived. Consequently, it is difficult for this court to discern how any notice of the arrival of these goods was ever sent or could be sent. A notice of an "expected arrival" is not, in my opinion, compliance with the limitation provision which was inserted in the defendant's own words. It is fundamental that this limitation provision must be strictly construed against the defendant. If the defendant had sought to protect itself by some limitation period after a complete loss, it could have so provided. The wording used in the endorsement in question, in my opinion, is inadequate for this purpose. The notice (Exhibit 6) is not, therefore, a compliance with the time limitation endorsement drafted by the defendant and claimed to have been added to the policy. A notice of the arrival of the shipment presupposes the actual arrival of the goods. An expected arrival ordinarily is not sufficient. See General Refrigerators Corporation v. Acme Fast Freight, Inc., City Ct.N.Y., 1945, 60 N.Y.S.2d 370, 371.

The defendant argues in substance that the "Arrival Notice and Freight Bill" (Exhibit 6) constitutes the only notice of arrival of a shipment which an insured receives and that the receipt of this document must be viewed as the event which starts the running of the time limitation if the limitation is to have any meaning at all. It is unnecessary to determine whether the "Arrival Notice and Freight Bill" received by plaintiff would. have been sufficient for the purpose urged by defendant had the shipment actually arrived. Here, the shipment was totally destroyed and the notice of arrival was illusory.

Conclusions of Law

1. This court has jurisdiction over the parties and the subject matter.

2. On July 28, 1952, policy MOC 1208, issued by the defendant to the plaintiff, was in full force and effect.

3. By virtue of the cargo loss sustained by plaintiff on said date on the M/S Black Gull, plaintiff became entitled to recover from the defendant the sum of $57,948.69.

4. Defendant's payment of $52,000 by check dated August 25, 1952 did not constitute an accord and satisfaction of plaintiff's claim for freight plus 10% due by reason of said loss.

5. Plaintiff's claim for freight plus 10% is not time-barred by reason of the twelve month contractual period of limitation contained in the endorsement dated February 15, 1952.

6. The defendant has refused to pay the balance of $5,945.69 due and owing to the plaintiff under said policy, although payment has been duly demanded.

7. Plaintiff is entitled to judgment in the sum of $5,945.69 less $7.44, being the additional premium earned by the defendant under said policy, together with interest and costs.

Settle judgment on notice in accordance herewith.