**Myles J. ROSENTHAL, Plaintiff,**

v.

**Kenneth Gordon POLAND, Defendant.**

**No. 66 Civ. 2195.**

United States District Court,
S. D. New York.

Feb. 7, 1972.

27. Solari deposition at pp. 12–14.

Healy & Baillie, New York City, for plaintiff; by Bruce A. McAllister, New York City, of counsel.

Symmers, Fish & Warner, New York City, for defendant; by Frederick Fish, New York City, of counsel.

## OPINION

NEWMAN, Customs Court Judge, Sitting by Designation.

Plaintiff[1] sues, pursuant to the admiralty and maritime jurisdiction of the court (28 U.S.C. § 1333), to recover under a contract of marine insurance for a constructive total loss of the ferryboat *Orange* in May 1965. The complaint demands judgment for $99,500, representing the insured vaue of the vessel ($100,000) less the proceeds of the salvage ($2,000), plus "sue and labor" expenses ($1,500), interest from May 23, 1965, and costs.

Defendant does not dispute the execution and delivery of the insurance contract, nor that there was a constructive total loss of the *Orange*. Rather, defendant denies liability under the policy primarily on the basis that plaintiff alegedly misrepresented and concealed material facts concerning the value of the vessel. Inasmuch as defendant considers the policy to be void, return of

[1]. Subsequent to the commencement of this action Myles J. Rosenthal (a 41 year old bachelor) died and the administrators of his estate (Michael M. Rosenthal and Lawrence L. Rosenthal) were substituted as plaintiffs. Reference herein to "plaintiff" shall mean Myles J. Rosenthal. Similarly, during the course of these pro-ceedings the defendant Kenneth Gordon Poland (who represented certain other underwriting members of Lloyd's of London) died, and John Michael Poland was substituted for the original defendant. Reference herein to "defendant" shall include all the underwriters.

all premiums has been tendered to plaintiff. Hence, the basic issue concerns the validity of the contested insurance contract.

### The Record

Plaintiff introduced ten exhibits in evidence, submitted for identification two series of checks and their listing, a contract for "sale" of the *Dutchess* (a "sister ship" of the *Orange*), and called five witnesses:

Lawrence L. Rosenthal — brother of Myles, and his insurance broker;

Richard LeVangie — a computer engineer, who had boating and navigation as hobbies, and had contacted Myles Rosenthal to offer his services as a volunteer upon learning of Rosenthal's purchase of "one of the old Newburgh ferryboats";

Conrad Milster — chief engineer at Pratt Institute in Brooklyn, intensely interested in machinery and a collector of marine artifacts;

Frank O. Braynard — a "specialist in the ports and intermodel section" of the Maritime Administration, and an "expert in the field of preservation and historical employment of vessels of historical import";[2] and

William B. Mollard, Jr. — a ship sales broker, who identified an executed contract dated May 23, 1967 relating to the sale of the *Dutchess* for "box topping", i. e. increasing the gross tonnage from 596 to 1,500 under the Ship Exchange Act.

Defendant introduced seven documents in evidence, but called no witnesses. The documents are:

Exhibit A — A "Report of Survey" by Marine Claim Services, Inc. covering the nature and extent of the damage to the *Orange*.

Exhibit B — Toplis and Harding, Inc. survey report covering the damage to and thefts from the *Orange*.

Exhibit C — A memorandum from F. M. Pommer of Wohlreich & Anderson, Ltd., correspondent brokers, to Swann & Everett, Ltd., Lloyd's brokers, forwarding "copies of expired cover notes, survey and snaps", and requesting that insurance coverage on the *Orange* be bound immediately.

Exhibit D — Cover notes for the *Orange* addressed to Sayre & Toso, Inc. by Joseph Hadley (Insurance) Ltd.

Exhibit E — A letter from Swann & Everett, Ltd. to Wohlreich & Anderson, Ltd., forwarding a cover note relating to the *Orange*.

Exhibit F — A "speed message" from F. M. Pommer to Swann & Everett, Ltd. requesting the underwriter's agreement to painting, "fixing up" and charging the boilers of the *Orange* for Coast Guard testing.

Exhibit G — A survey report on the *Orange* by the United States Salvage Association Inc., per L. R. Chapman, Surveyor, indicating an "estimated cost of reproduction" of $750,000 and an "estimated market value" of $100,000.

### Background

Until November 3, 1963 the New York State Bridge Authority operated the Beacon-Newburgh ferry line for transporting passengers and automobiles across the Hudson River, and for that purpose utilized three vessels: the *Orange*, the *Dutchess* and the *Beacon*. On November 2, 1963 the newly constructed Beacon-Newburgh Bridge was opened, and the Bridge Authority advertised for sealed bids on the three vessels.

Since the early 1950's, plaintiff had held an especial interest in the steam propelled ferryboats plying the Beacon-Newburgh line, located near the boarding school he attended in Hyde Park. Indeed, the Beacon-Newburgh line had historical significance, having been in con-

2. Mr. Braynard detained a long list of his directorships and consultation services for numerous museums and other institutions dedicated to the preservation of vessels. Further, Mr. Braynard testified he has written nine books on ships and "hundreds of magazine articles," has "fourteen

27 drawer steel cabinets loaded with deck plans, literature, specifications and photographs", has over 50,000 photographs of vessels, 2,000 oil paintings and prints of steam passenger ships and "probably 5,000 books about them" (Tr. 166–167).

tinuous operation since it was chartered by King George II in 1743.

Later, and as an engineer by profession, plaintiff was a steam machinery and ferryboat buff. He had an extremely strong interest in reciprocating steam engines, particularly those found on vessels that were rapidly disappearing from the East Coast of the United States by 1960, with an intense basic concern in the preservation of this type of machinery.

Upon learning that the Beacon-Newburgh Bridge was to be constructed, plaintiff became interested in the *Orange* since he knew completion of the bridge inevitably would result in the termination of the ferry service. So far as plaintiff knew, the Beacon-Newburg ferry line was the last ferry service operating north of New York City.

Prior to the actual termination of the ferry service due to the completion of the Beacon-Newburgh Bridge, plaintiff, accompanied by another engineer and machinery hobbyist, Conrad Milster, made numerous trips to and on the *Orange* to take motion pictures, sound recordings of her propulsion plant, and make examinations of her hull.[3] From these studies, plaintiff learned that the *Orange* had several unique characteristics: she was a steam-driven, hand-fired, coal burning ferry that typified not only vessels of her time (she was launched in 1914), but also of those built around 1880; the *Orange* was one of the last of the double-ended ferries; the boat possessed substantially all of her original materials, viz. her hull, propulsion machinery and superstructure were substantially the same in 1963 as when she was built;

despite her nearly fifty years of age, the *Orange* was in "mint condition" having been well maintained; from an operational standpoint, the *Orange* represented an excellent compromise between maximum size and minimum expense; and the *Orange* was certificated by the United States Coast Guard for carriage of passengers.

In sum, plaintiff concluded that the *Orange* was "the last of a kind," and the only vessel on the Beacon-Newburgh line worthy of preservation as an operating commercial artifact of the steam navigation era.[4] Consequently, plaintiff decided to submit a bid to the Bridge Authority, mainly motivated by the fear that if he did not purchase the *Orange*, the ferryboat would be scrapped.

In arriving at a figure to submit as a bid at the sale of the *Orange*, plaintiff knew that the market for ferryboats was relatively limited and that the *Orange* would probably be sold for her scrap value. Two bids were submitted for the *Orange*, one for $2,850 by plaintiff and another for $2,600 by Witte Marine Equipment Co., a dealer in used marine equipment. Plaintiff's bid was accepted. The *Dutchess* and *Beacon* were sold to Witte for $2,600 and $2,100, respectively. Of the three vessels, the *Orange* had the most expensive equipment, including some $9,000 worth of radar equipment, as well as valuable copper estimated by plaintiff to be worth $5,000 or $6,000.

The sale of the *Orange* to plaintiff and the purchase price were accorded considerable prominence and publicity in eight metropolitan newspapers (including The New York Times, the New York Herald Tribune, the New York Sunday

---

3. Milster testified that the sound recordings gave an indication of the physical state of the propulsion machinery by the absence or presence of pounding, and that every type of steam engine has a characteristic sound which is peculiar to that type of engine.

4. The oldest of the three Beacon-Newburgh ferries was the *Dutchess* which was launched in 1910. In 1961, the Dutchess suffered about $100,000 worth of fire dam-

age and the damaged portion was reconstructed only for temporary use, inasmuch as the New York State Bridge Authority contemplated termination of her service upon completion of the bridge. The *Beacon* was originally a Boston army ferry built in the 1920's, and thus was not original with the ferry line. While the *Dutchess* was essentially the same as the *Orange* from the main deck down, the *Beacon* was a substantially different vessel.

News [5] and the New York Journal American), on television,[6] and in the bimonthly historical magazine *American Heritage* distributed all around the world. An eleven page article in the April 1964 *American Heritage*, "Farewell to the Ferry" (pp. 38–49), speaks of the *Orange* in its opening paragraph and contains a picture of that ferryboat on the first page. In a subsequent portion of the article, almost two pages (pp. 48–49) are devoted to a second large picture of the *Orange* with several paragraphs specifically discussing the *Orange* and her "still-glowing brasswork". The article states, in part (at page 49):

> For the *Orange* herself there may yet be a few years of answering engine-room bells added to the even fifty she has already put in. At the auction which saw her sisters sold for scrap, she was bid in for $2,850 by Myles Rosenthal, a consulting engineer for whom she had become a *femme fatale*. Late last fall, he and a group of friends fired up her coal-burning boilers and brought her down the Hudson to Jersey City, where he plans to refit her for charter trips. * * *

Virtually all the articles—including those published in the widely circulated *Times* and *Herald Tribune*—emphasized the fact that the *Orange* had been purchased at auction for the sum of $2,850. Thus, the *Times* of November 26, 1963

carried a feature story [7] stating, in part: "Mr. Rosenthal bid $2,850 for the *Orange*, and since he was the high bidder, the New York State Bridge Authority indicated yesterday that he would become the likely owner * * *". And again, the *Times* on November 28, 1963, crediting an Associated Press report, stated in part: "Myles Rosenthal of New York City paid $2,850 for the third boat, the *Orange*".

The *Sunday News* of December 29, 1963, page 4, carried a full page illustrated story [8] depicting Rosenthal and the *Orange*, reciting the details of the purchase.

The *Orange* was delivered to plaintiff at Beacon, New York on November 24, 1963. After a good deal of work performed by plaintiff and several other ferryboat buffs, the *Orange* sailed down the Hudson River on November 30, 1963 with great fanfare to Jersey City, New Jersey where the boat was drydocked.[9] In the dramatics of that occasion, "[e]n route her whistle defied the enemy by saluting every river town that had once had a ferry".[10] Thereafter, she was moored at several different docks or piers. From the time the *Orange* arrived at Jersey City in late 1963 until her destruction and sale of the salvage about two years later, the vessel was under virtually continuous maintenance and repair.[11] Plaintiff paid for a great deal of

5. The New York *Sunday News* has the largest circulation of any newspaper in the United States.

6. A tape of the television interview of Rosenthal filmed by C.B.S. was viewed by me at the trial, and at a subsequent conference. The film thus presented the unique situation of making available plaintiff's "testimony" after his death. Myles Rosenthal was a clean cut young man, and deeply impressed me with his sincerity. Mr. Rosenthal was very articulate and proved to be an excellent witness. It should also be mentioned that in addition to the film, plaintiff made available to the court extensive slides depicting the *Orange*.

7. Martin Arnold, "Discarded Ferryboat Finds a Friend".

8. Francis M. Stephenson, "Historic Ferry to Sail On".

9. A feature article by McClandlish Phillips, "Junk Men's Torches Finish Off A Dream That Vandals Spoiled," *The New York Times*, March 25, 1966, states: "He [plaintiff] remembers November 20, 1963, as 'the day we came down the river.' Mr. Rosenthal had 50 friends aboard the green-hulled wooden relic. A plume of smoke trailed from her one black stack and a crew of seven put the ferry in at Jersey City".

10. C. B. Mitchell and David Plowden, "Farewell to the Ferry," American Heritage, Vol. XV No. 3 (April, 1964), 49.

11. The *Times* feature article of March 25, 1966, *supra*, states: "He [plaintiff] put in 'many thousands of hours' and poured $28,000 cash into the craft, huddling near a potbellied stove on blizzardly winter nights when the temperature was 2 above zero, to keep her pipes from freezing".

the work on the boat, but a goodly portion was performed by plaintiff's associates and friends with the understanding that compensation would be paid to some of them when the vessel went into commercial service.

Several different potential uses for the *Orange* were considered by plaintiff and his friends. Initially, plaintiff intended merely to remove the machinery from the vessel and present it to the Smithsonian Institute in Washington. But in view of the excellent condition of the *Orange,* plaintiff decided to preserve the entire vessel, and put her to some type of commercial use which would pay the expenses of upkeep. Possibilities then considered were redesigning of the ferry boat as a floating restaurant and night club, or chartering of the *Orange* to excursion groups for trips in or around the New York Harbor and up the Hudson River. In point of fact, early in 1964 and again with fanfare, the *Orange* carried a charter party of 350 persons from the Battery in Manhattan to Shea Stadium in Flushing, New York City, for which plaintiff was paid $1,000 by the group organization for the afternoon. Although the *Orange* was used for but one charter trip, plaintiff received many inquiries from other groups and organizations, who were interested in using the vessel, such as: The World Steamship Society, the Steamship Historical Society of America, Empire Railway Museum, Branford (Conn.) Electric Railway Association, New Jersey Museum of Transportation, Celanese Corp., and Alcoa. At his deposition, plaintiff testified, albeit vaguely, that he was approached on two different occasions after the purchase to sell the *Orange,* but he rejected "offers" in the $35,000 to $40,000 range because he "thought that the *Orange* had a much greater potential". The "offers" stemmed from the destruction of a bridge across Lake Maricaibo, and the need for a wood-burning vessel on the Orinoco River in Brazil.

Between May 16 and May 23, 1965, the *Orange* was boarded by thieves who forcibly entered various compartments of the vessel and stole equipment, inflicting extensive damage to the vessel. A loss report and itemization of damages were timely submitted by plaintiff to defendant. After extended but fruitless discussions with defendant's adjusters concerning possible repair of the *Orange,* plaintiff made claim against defendant for a constructive total loss. The underwriters declined plaintiff's notice of abandonment and refused to pay the claim. On or about April 6, 1966, the *Orange* was sold by plaintiff to Mobray's Floating Equipment Exchange in Jersey City, N. J. for $2,000.[12]

*Insurance*

Plaintiff left the procurement of insurance for the *Orange* in the hands of his brother, Lawrence. However, the *Orange* was the first ferryboat that Lawrence had been called upon to insure, and hence he made inquiries of several domestic insurance companies. Lawrence ascertained that the Home Insurance Company had covered the *Orange* for $100,000 during its ownership by the New York State Bridge Authority. Inasmuch as the most favorable premium could be obtained in the London market, Lawrence decided to place the insurance there, and channelled the placement of a policy through a correspondent broker. Immediately after the purchase of the vessel, a policy was placed in London through the firm of Sayre & Toso, correspondent brokers. In connection with the placement of that policy, Sayre & Toso requested that a valuation survey be performed by the United States Salvage Association, Inc., which highly regarded firm represents many major marine underwriters throughout the world. A report dated January 13, 1964, signed by Louis R. Chapman, Surveyor for the United States Salvage Association, Inc., was submitted to Sayre & Toso, indicat-

12. The radar equipment had been removed from the vessel by plaintiff and was not included in the sale to Mobrays (Tr. 127, 158).

ing an "Estimated cost of reproduction" of $750,000 and an "Estimated market value" of $100,000 for the *Orange*.[13] Thereupon, a policy was issued to plaintiff by London underwriters insuring the *Orange* for $100,000.

In 1964 and during the period covered by the policy obtained through Sayre & Toso, a claim for relatively minor damage was submitted by Rosenthal after two barges broke loose from their moorings and struck the *Orange*. Because of a delay in the settlement of the damage claim, plaintiff withheld payment of renewal premiums. Eventually, this dispute was settled by payment in full, but at renewal time the underwriters determined not to renew the policy. Lawrence then obtained coverage by defendant under the instant policy though the services of Wohlreich & Anderson, correspondent brokers, who placed the insurance with Lloyd's of London, through the firm of Swann & Everett, Lloyd's brokers.[14] This, then, was at least the third policy for $100,000 issued on the *Orange* (as reflected by the record here).

At the Wohlreich firm an employee, Frances M. Pommer, handled the placement of the insurance on behalf of plaintiff. According to Miss Pommer's deposition, Lawrence submitted to her upon request a copy of the Sayre & Toso cover notes, a copy of the Chapman survey, and some snapshots of the ferryboat with information concerning the "volunteers" on the *Orange*, all of which were forwarded to Swann & Everett in London. The record is barren of any indication that Swann requested any additional information or documentation. Concededly, plaintiff never misled Lloyd's or anybody else—about the price paid! Indeed, plaintiff trumpeted in every way possible that he had purchased the *Orange* at auc-

tion for the "unbelievable figure of $2,-850". A policy covering the *Orange* was issued by Lloyd's for the period from January 29, 1965 to January 29, 1966 [15] "On Hull and Machinery and everything connected therewith *valued at US $100,-000*,"—"Whilst laid up not under repairs at New York and/or New Jersey" emphasis added).

Interestingly, a principal paragraph on the front page of the policy is couched in picturesque language reflecting the perils of distant seas facing mariners of centuries ago:

> TOUCHING the Adventures and Perils which we the Assurers are contented to bear and do take upon us in this Voyage, they are, of the Seas, Men-of-War, Fire, Enemies, Pirates, Rovers, Thieves, Jettisons, Letters of Mart and Countermart, Surprisals, Taking at Sea, Arrests, Restraints and Detainments of all Kings, Princes and People, of what Nation, Condition, or Quality soever, Barratry of the Master and Mariners, and all other Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Goods and Merchandise and Ship, &c., or any Part thereof; and in case of any Loss or Misfortune, it shall be lawful to the Assured, their Factors, Servants and Assigns, to sue, labour, and travel for, in and about the Defence, Safeguard and Recovery of the said Goods and Merchandises and Ship, &c., or any Part thereof, without Prejudice to this Insurance; to the Charges whereof we, the Assurers, will contribute, each one according to the Rate and Quantity of his Sum herein assured. And it is especially declared and agreed that no acts of the Insurer or Insured in recovering, saving, or preserving the property in-

13. Mr. Chapman's survey report was predicated upon his inspection and was made in conjunction with the head of the Association's estimating department, utilizing information from the Association's files concerning similar vessels.

14. The only persons authorized to do business with underwriters at Lloyd's are persons approved by the underwriters who are referred to as "Lloyd's brokers".

15. Although the policy period commenced on January 29, 1965, the policy was dated May 27, 1965.

sured, shall be considered as a waiver or acceptance of abandonment. And it is agreed by us, the Insurers, that this Writing or Policy of Assurance shall be of as much Force and Effect as the surest Writing or Policy of Assurance heretofore made in Lombard Street, or in the Royal Exchange, or elsewhere in London.

However, there is appended to the policy a "New York Suable Clause", stating:

The place of physical and actual issue and delivery of this policy is the City of London, nevertheless, at the option of the Assured, as between the Assured and the Assurers, the place of issue and delivery of the policy shall be considered the City of New York and all matters arising hereunder shall be determined in accordance with American Law and practice. Any suit hereon may be brought against these Assurers in any Court of competent jurisdiction within the United States. The summons and other legal processes may be served on these Assurers by and in behalf of the Assured by mailing a copy thereof by United States registered mail addressed to Wilbur H. Hecht,* all of the law firm of Mendes & Mount, 27 William Street, New York 5, N. Y. each of whom these Assurers hereby authorize to accept by and in their behalf such summons and other legal processes against these Assurers in any Court of competent jurisdiction within the United States. The mailing, as herein provided, of such summons or other legal processes shall be deemed personal service and accepted by these Assurers as such, and shall be legal and binding upon these Assurers for all the purposes of the suit. Final judgment against these Assurers in any such suit shall be conclusive; and it may be enforced in any other jurisdictions, including Great Britain, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and of the amount of this indebtedness. * * *

Applicable to policies subject to Section 59–a of the Insurance Law of the State of New York.

Underwriters hereon hereby designate the Superintendent of Insurance of the State of New York or his successor in office their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by and on behalf of the (re) insured or any beneficiary hereunder arising out of this contract of (re) insurance.

*The Materiality of the Purchase Price*

 In the law of marine insurance, it is fundamental that an insured is obliged to disclose voluntarily to the insurer all circumstances known to him and unknown to the insurer which materially affect the risk; and that failure to make such disclosure will vitiate the policy. Gulfstream Cargo, Ltd. v. Reliance Insurance Company, 409 F.2d 974 (5th Cir. 1969); King v. Aetna Ins. Co., 54 F.2d 253 (2d Cir. 1931); Btesh v. Royal Ins. Co., 49 F.2d 720 (2d Cir. 1932); Hauser v. American Central Insurance Co., St. Louis, Mo., 216 F.Supp. 318 (E.D.La.1963). Defendant insists that the purchase price of the *Orange* was a material circumstance, and that the nondisclosure thereof voided the policy as a matter of law. In support of its position, defendant heavily relies upon King v. Aetna Ins. Co., supra.

In *King*, the insurer issued a binder upon a yacht, insuring her for $10,000. The agreed valuation of the yacht was stated to be $40,000. One week after the binder was issued the yacht was totally destroyed by fire. The insurer set up several defenses to the policy including concealment of the fact that the true value of the yacht was only $2,500, the price paid by the insured for the yacht. Significantly, there was no evidence whatever of the value of the yacht as of the date of obtaining the insurance, except testimony as to actual purchase price paid for her by the insured only two months before. That record also shows the insured placed two additional policies

of $10,000 and $5,000 with other insurance companies, and was refused a third additional policy of $15,000 because he refused to divulge the purchase price.

In upholding the defense of concealment, the Court of Appeals held that: "[C]oncealment of an overvaluation so excessive as to make the risk speculative vitiates the policy". 54 F.2d at 255. The court also commented (id. at 255): "The valuation of a vessel at sixteen times what she had just cost the insured likewise makes the risk speculative; the insured had less incentive to protect her than he would had he paid a sum somewhere near commensurate with the stated value".

That holding is readily distinguishable and not dispositive here.

Although the *Orange* was valued and insured in excess of thirty-three times the sum paid at auction for her, there are important factual differences between *King* and the present case.

In *King*, the Court of Appeals emphasized there was "no evidence whatever" of the value of the yacht, except the purchase price paid by the insured only two months prior to the loss. In this aspect, the court observed (54 F.2d at 254):

&#42; &#42; &#42; *The purchase price is, of course, not conclusive of the value,* but it certainly justifies an inference, *in the absence of anything to the contrary,* that her value was not $40,000 or anything like that figure. (Emphasis added.)

Here, I do not find an "absence of anything to the contrary". In point of fact, there is substantial evidence that the true value of the *Orange* far exceeded the price paid by plaintiff: the New York State Bridge Authority had insured the *Orange* for $100,000; initially London underwriters had insured the *Orange* for $100,000; the United States Salvage Association, Inc. valued the *Orange* at $100,000—in the parlance of the industry—"for insurance purposes"; and plaintiff had been approached, vaguely it is true, with purchase offers in the $35,000 to $40,000 range. Additionally, a substantial historical value for the *Orange* appears conclusive in the light of the uncontradicted expert testimony presented by plaintiff and the evidence adduced concerning the extensive publicity accorded the vessel after her sale by the New York State Bridge Authority. And finally, the commercial potential of the *Orange* for chartering to companies or groups as well as her possible use as a floating restaurant or night club were demonstrated.

In sum, the record here shows that plaintiff obtained a fantastic bargain when he purchased the *Orange* for $2,850. Under these circumstances I conclude that the purchase price was not a material fact.[16]

I have also considered the comment in *King* concerning a lack of incentive by the insured to protect the yacht. Clearly, that comment finds no support here, and has no application to the instant case where plaintiff's prime motivation in purchasing the *Orange* was to preserve and restore her. The uncontradicted testimony shows that great care and attention was lavished lovingly on the *Orange*.

### Misrepresentation of Value

 Defendant further contends that the Chapman survey misrepresented

16. This conclusion renders it unnecessary to consider plaintiff's contention that the newspaper publicity given the sale of the *Orange* constituted notice to the underwriters of the purchase price. Consequently, I express no opinion on that issue. However, it is of interest to note that "[c]ases &#42; &#42; &#42; rarely occur in which the insurers seek to avoid a policy on a ship on the ground that there was no disclosure of the fact that the valuation therein was excessive, because the insurers usually have ample information about the vessel, which enables them to form a fairly accurate estimate of her value". Arnold. British Shipping Laws (15th Edition, 1961), Vol. II, page 573.

the "market value" of the ferryboat. Chapman's deposition indicates that the United States Salvage Association, Inc. frequently performed surveys for underwriters to determine the "fair insurance value" of a vessel. Such valuations were commonly designated as "market value" whether or not actually predicated on sales data. According to Chapman, the term "market value" in marine insurance parlance refers to value for insurance purposes only, and "this is a carryover from years of practice that has gone on before".[17] It further appears from Chapman's deposition that while the Association in making a valuation of a vessel frequently consults data pertaining to sale prices of vessels similar to that being surveyed, if available, another method of determining value for insurance purposes is cost of reconstruction less straight line depreciation. That was the method the United States Salvage Association used in valuing the *Orange* at $100,000. Cf. American Mail Line, Ltd. v. Skagit River Navigation & Trading Co., 91 F.2d 835, 844–845 (9th Cir. 1937).

Although bearing the burden of proof on its affirmative defenses, defendant adduced no expert testimony concerning either the value of the *Orange* or underwriting practices in marine insurance. Consequently, I see no basis for finding any misrepresentation in the Chapman report. Inasmuch as I find that there was no misrepresentation of value by plaintiff, the defendant is bound by its contract and the valuation agreed upon therein ($100,000) is conclusive upon the parties, such valuation being a form of liquidated damages. St. Paul Fire & Marine Ins. Co. v. Pure Oil Co., 63 F.2d 771 (2d Cir. 1933); The St. Johns, 101 F. 469 (S.D.N.Y.1960); see also Aetna Ins. Co. v. United Fruit Co., 304 U.S. 430, 434, 58 S.Ct. 959, 82 L.Ed. 1443 (1938); Richards on Insurance (5th Ed.), Vol. 1, § 21.

### Protection of the Orange

■ Finally, the court has concluded that the *Orange* was kept in a reasonably safe place and that plaintiff used due care in protecting her.

Defendant's innuendo that the *Orange* was moored in a "graveyard", as an incentive for pilferage, is wholly without merit. Quite apart from the testimony adduced regarding the safety factor in and around Morris Canal where the *Orange* was moored, is the added definitive statement by Mr. Braynard that the Morris Canal "is a busy section", and "as good as fifty percent of the harbor today" of the "nearly 600 miles of improved waterfront in New York Harbor".[18] Mr. Milster, too, noted that "We discussed a number of areas but we ended up deciding that no area that we could make arrangements with or come up with would be that much safer than where we were to justify the moving of the vessel."[19]

Similarly, the observation by defendant that the *Orange* should have been secured by watchmen is without merit.

### Reserved Rulings

1. Defendant's motions to dismiss are denied.

■ 2. Defendant's objection to the receipt in evidence of plaintiff's answers to interrogatories (propounded by defendant) is sustained inasmuch as the answers are self-serving. Interrogatory answers are admissible only against the party who made them. See Haskell Plumbing & Heating Company v. Weeks, 237 F.2d 263, 16 Alaska 436 (9th Cir. 1956); United States v. Smith, 95 F. Supp. 622 (W.D.Pa.1951); Bailey v. New

---

17. Transcript of Chapman deposition, p. 31.

18. Tr. 179–81

19. Tr. 163

England Mut. Life Ins. Co., 1 F.R.D. 494 (S.D.Calif.1940).

■ 3. Defendant's objection to the receipt in evidence of certain cancelled checks, check stubs, and a list of the checks (exhibits 8, 9, and 10 for ident.) offered by plaintiff is sustained. These proposed exhibits were not established as records kept in the ordinary course of business (see 28 U.S.C. § 1732), and in any event they were not connected up with the *Orange* by a proper foundation.

■ 4. Defendant's objection to the receipt in evidence of a contract of sale between Witte Marine Equipment Co., Inc. and Hudson Waterways Corporation covering the *Dutchess* (exhibit 15 for ident.) is sustained. The terms of the contract indicate that the sale of the *Dutchess* was a special transaction under a Government program for the acquisition of obsolete vessels and the promotion of construction of new vessels (see 46 U.S.C. § 1160 et seq.), and consequently the contract price would not necessarily represent the value of the *Orange* in the open market.

### Conclusion

The court finds that plaintiff is justly entitled to judgment in the amount of $98,000 plus interest and costs. Said $98,000 represents the agreed value of the *Orange* ($100,000) less the proceeds of the salvage ($2,000). Plaintiff's claim of $1,500 for "sue and labor" expenses (cleaning, towing and survey expenses) is disallowed since there is no proof in the record to substantiate the amount claimed.

■ Plaintiff claims interest from May 23, 1965. In admiralty cases allowance of interest and the rate thereof are matters within the sound discretion of the district court. Gardner v. The Clavert, 253 F.2d 395 (3rd Cir. 1958); Fireman's Fund Insurance Co. v. Standard Oil of Calif., 339 F.2d 148, 159 (9th Cir. 1964); Delta Supply Co. v. Liberty Mutual Insurance Co., 211 F.Supp. 429 (S.D. Tex.1962); Samincorp v. S.S. Rivadeluna, 277 F.Supp. 943 (D.C.Del.1967). While it is the general practice in admiralty courts to allow interest on the loss from the date of the loss, justice will be served by awarding plaintiff interest at the rate of 6% per annum from the date the complaint was filed, July 19, 1966, to the date of the entry of judgment herein. From the entry of judgment to the date of payment, plaintiff shall be allowed interest at the rate of 7½% per annum.

Respecting the radar, which the record indicates was part of Myles Rosenthal's estate at the time of trial, the complaint states that he is "ready and willing to deliver the said radar sets to Defendant * * *". Accordingly, it is ordered that the two radar sets be delivered to defendant upon payment of the judgment herein. If, however, the radar sets for any reason cannot be delivered to defendant, then the judgment herein shall be reduced by the sum of $9,000.

This opinion includes the court's findings of fact and conclusions of law.

I do wish to felicitate counsel for the plaintiff and counsel for the defendant, respectively, for conducting this proceeding in the finest traditions of our profession.