## BELLA S. S. CO. v. INSURANCE CO. OF NORTH AMERICA.

(Circuit Court of Appeals, Fourth Circuit. April 14, 1925.)

No. 2249.

**1. Insurance ⬅⮞255—Untrue answer to specific inquiry concerning risk avoids policy, regardless of materiality.**

Where specific inquiry concerning risk is made and an untrue answer given, policy is avoided whether inquiry and answer were, in view of court and jury, material or not.

**2. Insurance ⬅⮞272—False representation that vessel had profitable charter giving her value in excess of her market value held material and sufficient to invalidate policy.**

Where, in answer to request for explanation of apparently excessive insurance, sought on vessel, agent employed to negotiate such insurance falsely represented that vessel had value above its market value because of favorable charter, *held* representation was material and invalidated policy.

**3. Insurance ⬅⮞256(1)—False representation as to material feature of risk avoids policy.**

False representation as to material feature of risk avoids policy.

**4. Evidence ⬅⮞357—Correspondence between insurance brokers negotiating policy not communicated to insurer held properly excluded in action on policy.**

Where insurance on steamship was obtained by insurance brokers acting through a second brokerage firm in another city *held*, in action on policy, correspondence between the two brokers not communicated to the insurer was properly excluded.

In Error to the District Court of the United States for the District of Maryland, at Baltimore; Morris A. Soper, Judge.

Action by the Bella Steamship Company against the Insurance Company of North America. Judgment for defendant (290 F. 992), and plaintiff brings error. Affirmed.

Emory H. Niles, John Henry Skeen, and Edgar Allan Poe, all of Baltimore, Md. (Edwin H. Brownley, of Baltimore, Md., on the brief), for plaintiff in error.

Stuart S. Janney, of Baltimore, Md., and T. Catesby Jones, of New York City (James W. Ryan and Bigham, Englar & Jones, all of New York City, and Janney, Ober, Slingluff & Williams, of Baltimore, Md., on the brief), for defendant in error.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

WOODS, Circuit Judge. The Bella steamship, owned by the plaintiff, the Bella Steamship Company, foundered about 160 miles north of San Salvador early in the morning of June 18, 1922. She was covered by an insurance policy issued February 1, 1922, by the "American Marine Insurance Syndicate C" for $143,000. The defendant, Insurance Company of North America, was a subscriber to the policy to the extent of 5.625 per cent.; and this action is brought to recover that per cent. of $143,000. Two defenses were set up: First, scuttling of the ship by the design and connivance of the owner for the purpose of recovering the insurance; second, concealment and misrepresentation of facts material to the risk. On the trial the District Judge held the evidence of the first defense raised an issue of fact which the jury only could decide, and refused to direct a verdict for the defendant on that point.

Holding that the uncontroverted evidence conclusively proved concealment and misrepresentation of facts material to the risk before the policy was issued, the District Judge on this ground held the policy invalid and directed a verdict for the defendant. The vital question here is whether this was a correct instruction.

The Bella Steamship Company is a corporation organized under the laws of Maryland for the purpose of owning and chartering for hire the steamship Bella. The corporate stock was owned at the time of organization by Antonio Carozza and two others in equal shares. Carozza had purchased the vessel from the United States government for $137,000 as a private investment, paying 10 per cent. in cash, and agreeing to pay 15 per cent. 30 days after the initial payment; the remainder of the purchase price was covered by his promissory note, payment of which was secured by a mortgage on the vessel. Carozza spent large sums for repairs to put the vessel in a seaworthy condition. The Bella Steamship Company took over the vessel from Carozza for $320,000, the total amount it had cost him.

On February 1, 1921, the Bella was chartered to the Baltimore & Jamaica Trading Company for one year at $14,000 a month; the owner agreeing by the terms of the charter to pay for insurance, wages, and provisions for the officers and crew, and to keep the vessel in serviceable condition. When the vessel began to operate, the company owed between $35,000 and $45,000 for repair bills besides what was still owing on the purchase price to the government. In June, 1921, Carozza became sole owner of the stock in the steamship company. In January, 1922, the indebtedness had been in-

creased by another bill for repairs for $40,-000.

Near the close of the first year, the Baltimore & Jamaica Trading Company indicated its willingness to recharter the vessel at a reduced rate. Carozza employed the Maury Donnelly-Williams Company, insurance brokers of Baltimore, to obtain insurance on the Bella for the second year, upon a valuation of $286,000; one-half of the valuation being the basis of insurable value. Maury Donnelly-Williams Company in turn employed Johnson & Higgins of New York, who obtained the insurance for the plaintiff. On February 10, 1922, the Bella was rechartered to the Baltimore & Jamaica Trading Company for six months at $5,500 a month.

The representation alleged to be material and false was made partly in writing and partly by telephone. On December 23, 1921, Johnson & Higgins, brokers employed by the plaintiffs, formally applied to the American Marine Insurance Syndicate for insurance "for $286,000, at and from February 1, 1922, to February 1, 1923 (noon Eastern standard time), on the vessel called the steamship Bella. Valued at, hull, etc., $190,665; machinery, etc., $95,335; total $286,000.00." Accompanying the application was a letter from Johnson & Higgins to the Insurance Syndicate in which they said:

"This vessel was bought by the present owners in the fall of 1920 at which time she was thoroughly overhauled and placed in first-class condition. Mr. A. T. Carozza, the controlling owner, is a man of large means and one of the principal building contractors of Baltimore. We understand that both the controlling owner and the management of the vessel bear an excellent reputation.

"The vessel is engaged on a profitable charter in the fruit trade between the West Indies and United States ports, principally Baltimore, and arrangements are already in progress for renewal of this charter for another year.

"We will be obliged if you will kindly indicate to us the rate at which you are willing to write all or part of this insurance at the earliest possible date and if you desire any information prior to your next meeting and will communicate with the writer we will try and supply you with it with as little delay as possible."

In addition to this written representation that the vessel was under a profitable charter for the year 1921, Brengle, the representative of the Syndicate, testified as follows:

"We did not have the insurance on the Bella during the year 1921, and we had no insurance on the Bella when I received this letter from Mr. Becker. I telephoned Mr. Becker and asked him why the value was so high, that it was out of line with other values of similar vessels, and that it would be necessary for me to have some explanation in order that I might put that before the rate committee when the vessel came before them for rating. Mr. Becker, in addition to the information given to me by him in the letter, stated that the vessel was enjoying a very profitable charter, which meant a net income to the owners of 6 per cent. on $500,000."

This evidence was corroborated by the testimony of Becker. The falsity alleged and relied upon as vitally affecting the risk is in the statement that the operation of the vessel under the charter during 1921 was profitable, that it had netted 6 per cent. on $500,000, and that arrangements were in progress for a renewal of the charter for another year.

Brengle testified that while the market value of a vessel is the general basis of determining the amount of the insurance to be carried, the market value is not necessarily controlling. He said:

"It is not unusual for some owners, where they have a vessel in a special trade, or which is enjoying a profitable charter, to insure that vessel for more than the market value, and when representations are made to us that such is the case, we would be willing to accept vessels on a higher value than their market worth at the time the insurance attached."

He testified further in answer to a question from the court that the policy would not have been issued but for the assurances "that the vessel was enjoying a most profitable charter, which was in progress of renewal, in addition to which the owners were earning a net income of 6 per cent. on an investment of $500,000."

This undisputed testimony leaves no escape from the inference that the representations as to the current charter being profitable to the extent of 6 per cent. on a value of $500,-000, with a prospect of renewal, was made in answer to the request for explanation for what appeared to be an application for excessive insurance, the market value of the vessel alone considered; and that the representation was a basis for the insurance and was made as an inducement to accept the application.

Does the undisputed evidence prove that it was false? The charter called for the payment of $14,000 a month to the owner from February 7, 1921, to February 7, 1922. For lack of required speed this amount was reduced to $12,000 a month for part of the

time. Taking, however, $14,000 for the entire eleven months of operations in 1921—

The gross income from the charter
during 1921 was................$154,000.00
The total disbursements for the
same period were............... 130,668.25
                                 _____
Difference ...................$ 23,331.75

This difference between income and disbursements does not, however, represent net profit as a result of the operations for the year 1921. The plaintiff commenced repairs about December 20, 1921, which cost $20,-000. These repairs were made necessary by the operations of the ship under the charter. In addition to that the plaintiff had to deduct as off-hire for the time the vessel was laid up during the charter period, $4,400. The repairs were commenced and their extent at least approximately known when the representations above set out were made to the insurer on December 23, 1921, the date of the application; on December 27, 1921, when plaintiff's broker made the representations to Brengle; certainly on February 3, 1922, when plaintiff took the defendant's insurance policy issued on the faith of the representations. It seems clear beyond doubt that these items must be added to the actual disbursements as charges against the ship in computing the result of its operations under its charter for 1921. Thus it appears that instead of the ship being under a charter which produced a profit to the owner of 6 per cent. on $500,000, as represented by the insured, there was actually a loss in its operations of $1,108.25.

[1-3] Many authorities may be cited to the effect that when a specific inquiry concerning the risk is made and an untrue answer given, the policy is avoided whether inquiry and answer were in the view of the court and jury material or not, because the insurer has the right to decide for himself what is material to his risk, and his inquiry is notice to the applicant for insurance that he regards the answer material. Snare & Triest Co. v. St. Paul Fire & Marine Ins. Co., 258 F. 425, 169 C. C. A. 441; Kerr et al. v. Union Marine Ins. Co., 130 F. 415, 64 C. C. A. 617; Joyce on Insurance, § 114, and authorities there cited; 32 C. J. p. 1289. But if we leave that doctrine out of consideration, nobody can doubt that the representation here made was on its face material. Here the inquiry was: What is the explanation of the apparently excessive insurance applied for. The answer was specific; the vessel has a value to the owner above the market value because of the profitable char-

ter. A false representation as to a material feature of the risk avoids the policy.

No reasonable insurer will knowingly take an insurance risk when it is to the interest of the insured that the property should be lost. When the insurer said the market value of the ship was too high, and the agent of the owner replied as an inducement to the insurance that the objection of high value was offset by the fact that the vessel was under a charter in the fruit trade which returned a net income of 6 per cent. on $500,000, and this inducement turns out to be without foundation by reason of the misrepresentation of the plaintiff's agent, the owner cannot hold the insurer. Sun Mutual Ins. Co. v. Ocean Ins. Co., 107 U. S. 485, 509, 1 S. Ct. 582, 27 L. Ed. 337; Clark et al. v. Manufacturers' Ins. Co., 8 How. 235, 248, 12 L. Ed. 1061; Columbian Ins. Co., etc., v. Lawrence, 10 Pet. 507, 516, 9 L. Ed. 512.

[4] Error is assigned in the exclusion of correspondence between the Baltimore and New York insurance brokers of the plaintiff. These letters were not communicated to the Insurance Syndicate and therefore could not bind its subscribers. Even if competent, however, we do not see how they could have affected the vital issue of false representation as to the material facts on which the contract of insurance is founded.

The conclusion that the policy was void for misrepresentation makes unnecessary consideration of the averment that the ship was scuttled. We agree, however, with the District Judge that but for the plain misrepresentation in obtaining the policy, the issue as to whether the ship was scuttled would have been proper for the jury.

Affirmed.