**ALBANY INSURANCE COMPANY and United States Fire Insurance Company, Plaintiffs,**

v.

**Leonard WISNIEWSKI, Defendant.**

**Civ. A. No. 82–0155 S.**

United States District Court,
D. Rhode Island.

Feb. 14, 1984.

Gorham & Gorham, Arthur M. Read III, Bradford Gorham, Providence, R.I., Hoch, Flanagan & Snyder, Bertram E. Snyder, F. Dore Hunter, Boston, Mass., for plaintiffs.

Richard N. Morneau, Providence, R.I., Glen J. Vida, Union, N.J., for defendant.

## OPINION

SELYA, District Judge.

This is an action brought pursuant to 28 U.S.C. §§ 2201–2202 and Rules 9(h) and 57, Fed.R.Civ.P., by Albany Insurance Company ("Albany") and United States Fire Insurance Company ("USF"), to rescind, or otherwise to declare null and void, a binder of marine insurance issued jointly on their behalf to the named defendant, Leonard Wisniewski ("Wisniewski"). While the parties are of diverse citizenship and the requisite amount is in controversy, the plaintiffs' complaint invokes the court's admiralty jurisdiction. 28 U.S.C. § 1333.

Following a bench trial which began on December 13, 1983 and concluded on December 27, 1983, the matter was taken under advisement pending receipt of post-trial submissions by the parties. Compendious briefs have now been filed. This opinion constitutes the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

I. *Embarking on the Voyage*

The antecedents of the case at bar are convoluted, and certain aspects of the litigation are shrouded in mystery. Finical perscrutation of the facts is, therefore, a prerequisite to a reasoned consideration of the merits.

The centerpiece of this nautical chanty is the hydrofoil patrol vessel "Flagstaff." The Flagstaff was originally conceived and built by Grumman Aerospace Corporation ("Grumman") as an experimental warship for the United States Navy. The court had the benefit of the testimony of both Robert Johnston (who was in charge of Grumman's marine programs during the de-

sign/build period) and his successor, Walter Wohleking, who was piped aboard into Johnston's berth in 1973. Both Johnston and Wohleking were excellent and reliable witnesses: articulate, knowledgeable, and thoroughly professional. The court credits them, as well, as experts in matters relating to hydrofoils.

Initially, the Navy let two contracts, one to Grumman and one to The Boeing Company ("Boeing"). Each was to build a prototype hydrofoil vessel. It became evident early on, however, that the original design concepts were impractical; and the two ships (Grumman's "Flagstaff" and Boeing's "Tecumcari") were eventually completed as evaluation vessels for a hypothetical fleet of larger craft. While the Flagstaff and the Tecumcari were competitive in the sense that both were vessels of aluminum construction built to meet identical performance specifications, their designs were dissimilar.[1]

As completed, the Flagstaff's hull was 74.4 feet in length between perpendiculars and 82 feet long overall. She was designed for a full load displacement of 568 tons and to carry a crew of thirteen. She had a 21.4 foot beam and enjoyed dual propulsion systems: hull-borne and hydrofoil. The former operated on two diesel engines, using water jet propulsion. The latter involved three fully-submerged, subcavitating foils (controlled by a hydropilot instrument) which could be pivoted out of the water; when operating on her foils, the craft was powered by a Rolls Royce turbine. The vessel, in this mode, could achieve speeds five to six times greater than her wonted hull-borne velocity.

The Navy placed the Flagstaff into service in 1968. Operational results were mixed, at best. Some eight years later, she was transferred to the Coast Guard. As to events occurring after the Coast Guard took possession, the court had the benefit of, *inter alia*, depositions of Lawrence

---

1. As a matter of historical interest, the Navy eventually deep-sixed the Grumman version; and the larger hydrofoils eventually placed in mass service by the Navy, i.e., the PHM class of combatant vessels, were constructed by Boeing.

Bauer, a Grumman marine engineer, and David Power, who had served as the Flagstaff's engineering officer. In addition, both Wohleking (as Grumman's man-in-charge) and Johnston (who, subsequent to his departure from Grumman, had become a consultant for the Navy) continued their acquaintance with the vessel.

The Coast Guard's efforts to use its newly-acquired hydrofoil in a utilitarian manner proved, in the main, to be unavailing. The Flagstaff manifested a seabag full of imperfections: power-plant degradation had occurred, the vessel would not perform to specifications, mechanical unreliability and engineering casualties were the norm, and a major overhaul was plainly necessary. A signal transmission casualty idled the Flagstaff in March, 1978; and, in undergoing transmission repairs, persistent difficulty with maintenance of acceptable turbine gas temperature surfaced. It was evident that the vessel could not "fly" on her foils without risking terminal damage to the turbine. And, the turbine problem was particularly acute, as the engine was no longer in regular production. No test bed was available; spare parts were in short supply. After studying the lay of the land, the Coast Guard gave up the ghost and elected, in September of 1978, to decommission the vessel. It is undisputed that, at the time of lay-up, the Flagstaff was incapable of operating on her hydrofoils at her designed speeds. She was, and had increasingly become, a sea-going Rocinante, ready for the maritime equivalent of the glue factory. Upon decommissioning, the tatterdemalion craft was placed out of the water, on a cradle atop a pier at the Bristol (R.I.) Coast Guard facility.

After withdrawing the vessel from service, the Coast Guard made no further effort to rehabilitate her. The Flagstaff was, at best, a white elephant—and a wounded one, at that. The only realistic way in which the ship could have been fitted for continued reliable operation would have been to replace her turbine, reengineer her transmission, and repair her other salient defects. The cost of so doing would have been at least $3,000,000. And,

this estimate did not include the substantial further costs which would inevitably be associated with conversion of the vessel to other than military uses.

The mills of the bureaucrats grind slowly. Eventually, however, ownership of the Flagstaff was transferred to the General Services Administration ("GSA"); and, in October of 1980, the GSA advertised the Flagstaff for public sale. The advertisement cautioned that the vessel was incomplete; that parts and items were missing; and that the sale would be on an "as is" basis. The GSA bid specifications, while disclaiming any warranty, described the hull as being "in fair condition and towable without repairs." At the bid opening on November 6, 1980, four tenders were received. The high bid ($35,000) was rejected by GSA as insufficient, and the Flagstaff was reoffered. On December 9, 1980, the new bids (five in number) were unsealed. Wisniewski, using the *nom de plume* of "Milford Salvage", successfully offered $68,151.50. The defendant then requested, and received, an extension of time within which to take possession.

While the Flagstaff remained at Bristol, Wisniewski employed the part-time services of Coast Guard moonlighters to effect minor repairs and to ready the vessel for transit. One such worker was Richard Newcomb, an obviously nervous and tentative witness, whose testimony was, nonetheless, both truthful and helpful. Newcomb and his co-workers were able, after considerable effort, to put the hull-borne propulsion system into operating condition. But, the vessel was not fit for hydrofoil travel. The spare parts and related gear which Wisniewski had acquired as part of the GSA purchase were stored at Otis Air Force Base on Cape Cod. These were ultimately retrieved at the defendant's behest in the summer of 1981. Two government employees (Robert Mosher and Arnie Ikkela) testified as to this equipment. Mosher's testimony established that no fully-assembled engines were among the purchased items. The high-stands and the low-stands, essential for hydrofoil operation, were nev-

er claimed by Wisniewski from Otis. Lastly, it is of significance, given the widely divergent assertions of the parties as to the condition of the Flagstaff and her appurtenances, that Wisniewski did receive, with the spare parts, the maintenance records for the vessel, including the engine log and the machinery history data. These were never produced at trial; and, their absence was never explained.

## II. *Damn the Torpedoes Full Speed Ahead*

As the date neared for the defendant to remove his newly-acquired chattel from Bristol, the plot thickened. On or about September 23, 1981, Wisniewski contacted Adams & Porter, Inc. ("A & P"), a New York based marine insurance broker. His initial approach was by long-distance telephone to Robert Savage, A & P's chairman. It should be noted, parenthetically, that none of the defendant's dealings with A & P were conducted face-to-face. Wisniewski claimed to have been steered to Savage by a mutual friend, although he declined to identify the referrer. He asked to have A & P act as his broker in obtaining insurance coverage for the Flagstaff. His inquiry was transmitted through channels from Savage to David Adams (A & P's executive vice-president) to Joseph Valenza, an A & P employee engaged in the servicing of new prospects. Wisniewski wanted to secure both lift coverage in the $200,000/$300,000 range (referable to the impending placement of the ship in the water) and port risk coverage to attach thereafter. It is clear from the evidence that the comparatively low insurance ceiling sought for the lift coverage was fashioned on the theory that, given the nature

of the hoisting operation, the reasonably foreseeable loss and damage which could result from that peril (even in a worst-case situation) was severely limited.

The A & P officials testified by deposition. Wisniewski failed to testify at all. The court finds that the defendant represented to A & P that the Flagstaff then had a fair market value of roughly $2,250,000; that he had a solid offer of $1,200,000 from a vendee in Bangladesh, the sale being firm except for the execution of formal documents; that, in any event, he had a reserve customer in the same price range lurking in Saudi Arabia; that he intended to transport the vessel by sea from Bristol to the Riverside Shipyard in New Bedford, Massachusetts; and that the craft, including her hydrofoil impellent system, was in good operating condition. Wisniewski did not identify either putative foreign buyer. In elaboration of his statements as to condition, he assured A & P that the Flagstaff was then capable of operating at sixty-three knots on her foils and at fourteen knots when hull-borne. Wisniewski further told both Adams and Valenza that he had a "Lloyd's survey" bulwarking his market value claim.[2] Each and all of these representations were false and were made with intent to deceive. Valenza, apparently intimidated by what he erroneously perceived to be Wisniewski's tie to Savage,[3] and lulled into a factitious sense of security both by the reassuring presence of a supposed Lloyd's survey and by the bogus overseas purchase transaction, never asked Wisniewski what he had paid to acquire the vessel.

---

**2.** "Lloyd's survey" is a term of art in the shipping and marine insurance trades. It is, in effect, a "Good Housekeeping Seal of Approval" as to opinions of value and condition. To so qualify, such an appraisal must be authored by a surveyor endorsed by Lloyd's of London, with scrupulous adherence to accepted maritime standards. Wisniewski's surveyor (Kaltenbach) had no such credentials—nor was he, on this record, encumbered by any such scruples. And, the inference is inescapable that Wisniewski, who had dealt previously with Kaltenbach, was aware of this. Notwithstanding the absence of

any link between Kaltenbach and Lloyd's, Kaltenbach's survey report was done in a Lloyd's-type format and could not, on its face, be distinguished from a bona fide Lloyd's survey.

**3.** The fact that the defendant had cunningly introduced himself to A & P via Savage seemingly impelled Valenza, for no sensible reason, to lower the drawbridge over the moat of abecedarian insurance precautions. One would hope that, as a general rule, more care surrounded A & P's transactions than was manifested here.

The defendant proceeded to forward the much-trumpeted Kaltenbach survey to A & P. That survey was, in many respects, a work of fiction. It held the Flagstaff out to be in excellent and near-new condition, staunch, able, sea-kindly and fully found, and fitted with state-of-the-art gear. It set fair market value at $2,250,000. Yet, the surveyor (whose familiarity with hydrofoils ranged somewhere between scant and non-existent) had not actually witnessed the operation of any of the Flagstaff's machinery or equipment, and had not seen the craft afloat or underway. In addition to these wildly-inaccurate opinions, the survey misstated the facts in numerous other ways. By way of illustration, Kaltenbach affirmed that there were two new spare Rolls Royce gas turbine engines in storage (a taradiddle which, as noted earlier, was blown out of the water by Mosher's trial testimony); he overstated the fuel and water tank capacities of the ship; and he listed as part of the vessel's fittings equippage not on board or in existence. The survey report flatly proclaimed that "pertinent vessel's documents were presented for review," but this was materially false; the engine logs and machinery history records, for example, had not been shown to the surveyor. The court, having reviewed Kaltenbach's deposition, regards his survey as a rather puerile artifice contrived to inculcate in the reader an impression which dovetailed with Wisniewski's needs. Having taken the King's shilling, he had become the King's man. Truth and accuracy were, at best, secondary considerations. The comfort offered to the insurers by Kaltenbach appears, in retrospect, to have been as empty as a beggar's bequest; and Wisniewski was at all times privy to the charade.

The perfidy of the Kaltenbach survey is further evident from his description of the vessel as a "surface-piercing, super-cavitating" hydrofoil. This was totally garbled, inasmuch as the Flagstaff was a submerged foil vessel, and the foils were sub-cavitating. As indicated by several reliable witnesses, including both Johnston and a naval architect, Edward Hagemann, these differences were central to the operation, maintenance, and usefulness of the craft. Similarly, the survey ascribed a future useful life of fifteen to twenty years to the Flagstaff, an estimate which appears out of the blue, with no basis in science or in fact. And, the estimate was severely impeached by the credit-worthy testimony not only of Chief Warrant Officer Power, but also by that of Hagemann and of Bauer. Lastly, Kaltenbach's replacement cost figure for the Flagstaff, for what relevance it might have, was exaggerated by at least thirty percent.

The court finds that the fair market value of the Flagstaff in and about September of 1981 was only a fraction of the worth ballyhooed by the defendant and his tame surveyor. The vessel was, when constructed, an experiment; and, by the time of Wisniewski's purchase, the experiment had plainly failed. She was in poor condition and in need of major repairs. Moreover, she was ill-adapted for conversion to any useful modern-day purpose. The Flagstaff was not marketable for military or paramilitary service (even, as the defendant suggests, to the most undiscriminating of third-world nations), as necessary technical support was unavailable. As scrap, she was worth approximately $25,000. Generously viewed, the value of the craft and her appurtenances was what Wisniewski had paid GSA. This conclusion finds abundant support in the credible evidence of record; the opinion of Johnston and the testimony of several other witnesses, including Hagemann and Lawrence Roulstone (a marine broker possessing demonstrated expertise in the hydrofoil market) conduce to this end. Moreover, neither Wisniewski nor Kaltenbach were under any illusions as to value: both knew, in September of 1981, that the boat was worth no more than $68,000–$70,000.

A & P, however, swallowed the Kaltenbach survey hook, line, and sinker. After receipt thereof, the broker succeeded in

arranging coverage with Albany and USF.[4] Acting as the defendant's agent, A & P ingenuously reiterated to the insurers the same lies which Wisniewski had planted; and the insurers, relying on these prevarications, committed to the policy. Wisniewski was neither asked nor required to complete a written application therefor. The port risk portion of the coverage was in the face amount of $1,500,000. That coverage figure was a direct result of the defendant's misrepresentations as to market value and as to the Bangladesh buyer. A binder issued on October 29, 1981. Coverage was granted, *inter alia,* for the lift operation and for a trip from Bristol to Milford, Connecticut (limited, however, to hull-borne propulsion).[5]

### III. *The Sinking and Its Aftermath*

The craft was placed in the water without incident on November 3, 1981. This procedure was supervised by a surveyor retained by the insurers for this purpose, namely, Richard Miner of Hull & Cargo Surveyors, Inc. ("HCS").[6] After the boat was afloat, Miner determined that the hull was water-tight. On November 16, 1981, in pursuance of Wisniewski's instructions, Newcomb (assisted by another part-timer) took the Flagstaff under her own power across the bay to East Greenwich, Rhode Island, and moored the craft at a pier behind the Marinere Restaurant. No licensed skipper was aboard, nor had Newcomb been requested to obtain the services of a proper captain. Before setting out, he inquired of the defendant as to documentation and was told that Wisniewski would attend to that chore. Nevertheless, Wisniewski did not register or otherwise docu-

ment the Flagstaff as a private vessel at any time.

The pier contiguous to the Marinere was simply that; no repair facilities, guard service, or other protections were afforded. Newcomb secured the vessel, locking all passageways and hatches. He reported his arrival to Wisniewski by telephone. Wisniewski asked him to leave the keys to the vessel with Joseph Rossi, the proprietor of the restaurant. Newcomb could not locate Rossi, so he returned by automobile to Bristol with the keys. A day or two later, he delivered the keys to the defendant when Wisniewski came to Bristol to pay him. The vessel remained at the Marinere, unmanned, unattended, and unprotected.[7]

On Thanksgiving day, Newcomb, again following telephonic orders from the defendant, drove to East Greenwich to explain the operation of the Flagstaff to the crew which was to transport the vessel to Milford. Those persons (never identified by name) failed to appear. Rossi, however, was present and had the Flagstaff keys in his possession. At Rossi's instance and request, Newcomb gave him a cook's tour of the vessel and acquainted him with her workings.[8] In the course of this impromptu seminar, Newcomb took Rossi belowdecks, explicitly pointed out to him the sea valves and associated equippage, and explained their uses. Newcomb then closed everything down and re-secured the vessel. He departed the scene, returning the keys to Rossi's custody. Again, the Flagstaff was left untended.

While the exact details of what next occurred are veiled in a mist of conjecture, the upshot is clear: the Flagstaff was scut-

---

**4.** Albany was the lead insurer; but, USF had agreed to participate to the extent of fifty percent of the risk. The binder which issued on October 29 was countersigned by both companies. Virtually all of the underwriting dealings, however, appear to have been with Albany.

**5.** Subsequent to his initial mention of New Bedford, Wisniewski had informed A & P (which, in turn, advised the insurers) that the destination of the Flagstaff for its port risk period had been switched to Milford. This took place prior to the issuance of the binder.

**6.** As was customary in the trade, the insured bore the cost of the HCS engagement.

**7.** The circumstances of berthing at the Marinere were mysterious. The routine information sheet for the vessel was not filled out, and no slip rental contract was prepared or signed. The evidence indicates that Rossi was never paid for his accommodation.

**8.** Rossi made light of this training session. But, the court accepts Newcomb's version.

tled, resulting in her sinking on November 30, 1981.[9] Although the identity of the person(s) responsible for the sinking is obscure, the evidence points unerringly to the conclusion that the vessel foundered because of deliberate human intervention. The inflow of water resulted from the opening, by an unknown hand, of two bronze gate-valves [10] located beneath the sea chest in the galley area.

The tell-tale valves were discovered when the submerged vessel was raised on December 2, 1981 by Nicola Mennella, a marine salvor retained by Wisniewski. Mennella boarded the vessel that evening accompanied by David Wiggin of HCS (who had responded to the scene at the defendant's request). Wiggin testified unequivocally that the two valves were each in the full-open position; that neither was damaged nor defective; that water was being taken aboard in this manner in substantial quantities and at an accelerated velocity; that each valve took from eight to ten full manual turns to close; that, when shut, the influx of sea-water abated entirely; and finally, that the valves, in the closed position, exhibited no slippage.[11] Mennella substantially confirmed Wiggin's recollection, and the court credits this testimony without hesitation.

And, while this evidence rules out natural causes, it similarly—when coupled with other credible proof—negates any likelihood of itinerant vandalism. The valves were not open when Newcomb was last aboard the ship; and they were, in the normal course, hidden from casual view. Since access to them was barred when Newcomb locked up, and since there was no evidence of forced entry or of broken hatches or doors, whoever tampered with these valves must have had the keys to the Flagstaff.[12] The vessel was purposefully scuttled: to conclude otherwise (as this court once stated in a different context) "would be to elevate fiction above fact and to sanctify a reverence for coincidence which goes beyond any acceptable level of credulity." *Donovan v. Freeway Construction Co.*, 551 F.Supp. 869, 879 (D.R.I. 1982).

Following the loss and the reflotation, defendant—in a manner which belies his surveyor's earlier valuation of the craft—made not the slightest effort to preserve or protect the Flagstaff or her appurtenances. He did, however, vigorously pursue his claim against the insurers. He was assisted in this effort by Kaltenbach.[13] Within four weeks after the sinking, Wisniewski signed and submitted to the plaintiffs a sworn proof of loss and ancillary paperwork. These, too, were rife with sentient falsehoods. To identify but a few, the post-loss documents misrepresented Newcomb's status and qualifications, indicated that the vessel had been left attended at the Marinere, and falsely stated that the responsibility for obtaining a licensed captain for the Bristol-Milford cruise had been entrusted to Newcomb. Demand was

**9.** Raymond Morrissette, who worked in the area, described a group which boarded the vessel—apparently armed with the keys—on Saturday, November 28. But, although Morrissette was a credible witness, it would require a quantum leap to connect these anonymous people to the sinking.

**10.** These valves are depicted, as positioned when the Flagstaff was refloated, in photographs 17 and 18 within Exhibit 35–A. They were part of the equipment which Newcomb pointed out to Rossi. *See* text *ante.*

**11.** The Flagstaff has been in Mennella's possession since her sinking, inasmuch as Wisniewski has failed to pay the salvage charges. It is noteworthy that, in this two year period, the valves in question have remained tightly closed.

**12.** According to the former deputy chief of the East Greenwich Fire Department (the agency which received the first report of the sinking), it was necessary to use pry-bars and like paraphernalia to gain access.

**13.** Throughout (i.e., both before and after the loss), Kaltenbach was abetted in his efforts by a self-styled surveyor named Michael Shaw. Shaw was Kaltenbach's acolyte and regular assistant. Since Shaw's deposition testimony added little (if anything) to the totality of the court's knowledge, the court, while mindful that Shaw played Robin to Kaltenbach's Batman and that this dynamic duo worked as a team, refers only to Kaltenbach in this opinion.

made under the binder for payment in the face amount, viz., $1,500,000.

To augment the proof of loss, Wisniewski forwarded a damage survey dated December 15, 1981, prepared by Kaltenbach. That survey erroneously attributed the need for replacement of the turbine to the sinking. And, to make matters worse, Kaltenbach, under date of January 21, 1982, prepared a supplemental letter which was promptly transmitted by the defendant to the insurers. Among other distortions, that letter twisted a supposed discussion between Kaltenbach and Power inside-out. Power specifically denied Kaltenbach's account; and the court credits the denial. The January 21 letter was patently an invention contrived by Wisniewski and his surveyor, in a lame attempt to rehabilitate the credibility of the earlier condition and value survey and thereby to bolster the insured's claim.

Not surprisingly, the insurers refused to honor the proof of loss. Instead, on March 11, 1982, they brought the instant action to declare the rights and obligations of the parties under the insurance binder.[14] Wisniewski responded by suing on the policy. That action is presently pending in the United States District Court for the Southern District of New York. Proceedings therein have been stayed pending the outcome of this litigation.

**14.** At the time of the sinking, Wisniewski had not yet paid the full premium to the insurers. He tendered the balance after the loss, but all payments were seasonably refunded by the insurers (the rejection being based on essentially the same invalidity grounds as are presently before the court).

**15.** The actions of the defendant which the plaintiffs identify as sufficient to constitute a breach include his alleged violation of his duty of utmost good faith; the defendant's failure to man the vessel (which, plaintiffs say, constitutes a breach of either his implied warranty of seaworthiness or his express duty of due diligence, or both); and his failure to provide a safe berth, comprising a violation of his duty of due diligence. In addition, the plaintiffs argue that moving the vessel to East Greenwich amounted to a deviation and thus abrogated the contract. But, the deviation claim seems to be squarely answered by the language of the policy:

## IV. *The Tacks Taken by the Litigants*

A common theme underlies the plaintiffs' legal contentions: they are not obligated to perform the contract of insurance because the defendant's conduct reveals a deliberate plan to deceive and to confound. More specifically, the plaintiffs' allegations fall into three general categories. First, the insurers argue that, because of the defendant's concealment and misrepresentations at the time coverage was sought, they are entitled to rescind the insurance contract. Second, they asseverate that, if the coverage was ever in effect, the defendant breached it.[15] Third, even assuming that the binder did take hold and was not vitiated, the plaintiffs maintain that liability did not vest because the loss was not in consequence of a covered peril.[16] In asserting these claims, the plaintiffs aver that this action is governed by federal admiralty law; but they urge that, even if state law applies, New York law controls, and the merit of their contentions would be equally inexpugnable.

Challenging the application of either admiralty law or the law of New York, the defendant asserts that Rhode Island law governs. He opposes the claims for rescission and for breach of contract on the ground of factual insufficiency. On the issue of concealment, the defendant maintains that the burden is on the plaintiffs to inquire as to matters they believe to be

> This policy is extended to include delivery trip from Bristol, Rhode Island to lay up site Milford, Connecticut, *direct or otherwise.*
> Plaintiff's Exhibit No. 12 at 2 (emphasis added).

**16.** The plaintiffs argue that the defendant failed to rebut the presumption of unseaworthiness which arises from proof that a vessel sank in calm water. Assuming that the burden of proof is on the defendant and not on themselves, the plaintiffs maintain that scuttling was shown to be as likely as any cause of the loss and that the defendant has not proved that the loss was caused by a covered event. The plaintiffs further contend that the loss is not covered because the sinking was caused neither by a peril of the sea nor by a fortuitous event (sinking being the inevitable and ultimate result of opening wide the sea chest) and/or because the defendant's want of due diligence excepted the loss from coverage under the Inchmaree provision.

material, that their failure to do so is negligent, and that, given their indolence, they are barred from rescinding the contract. Further, the defendant argues that no material misrepresentations were made to the insurers, and alternatively, that if any were made they were not willful. He insists that, therefore, misrepresentation cannot form the basis for either rescission or breach of the insurance binder.[17]

### V. *Charting the Course: Applicable Law*

The first battery of contentions deals with the status of the marine insurance binder, that is, whether the contract should be held void *ab initio*. As a threshold matter, the court must determine what law applies to these issues. The parties have suggested three possibilities: federal admiralty law, Rhode Island law, and New York law.

■ As regards state law, under either the federal choice-of-law rules, *see Navegacion Goya, S.A. v. Mutual Boiler & Machinery Insurance Co.*, 1972 A.M.C. 650, 653–54 (S.D.N.Y.1972) (*Navegacion Goya I*), or the forum's choice-of-law rules for contract issues, *see, e.g., A.C. Beals Co. v. Rhode Island Hospital*, 110 R.I. 275, 286–87, 292 A.2d 865, 871 (1972), the law of Rhode Island would be inapposite in this case. *See also Roy v. Star Chopper Co.*, 442 F.Supp. 1010, 1015 (D.R.I.1977), *aff'd*, 584 F.2d 1124 (1st Cir.1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979) (diversity jurisdiction). Rhode Island has no substantial, legitimate interest here which would compel the application of its law. *Cf. Morrison Grain Co. v. Utica Mutual Insurance Co.*, 632 F.2d 424, 429 (5th Cir.1980); *Montaup Electric Co. v. Ohio Brass Corp.*, 561 F.Supp. 740, 744–45 (D.R.I.1983). The only connection which

this action has with Rhode Island is that, during all times relevant to the litigation, the Flagstaff was located in Rhode Island. Although the corporate plaintiffs do business in Rhode Island, each has its principal place of business in New York City (as does A & P). The defendant is a citizen of Connecticut. And perhaps most significantly, the negotiations for coverage pirouetted around New York, all of A & P's activities and dealings occurred there, and the marine insurance contract was issued in New York. If state law applies to this aspect of the suit, it is the law of New York.

Whether federal or state law should apply, however, is a much more enigmatic question. The uncertainty prescinds wholly from the United States Supreme Court's decision in *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). *See generally* G. Gilmore & C. Black, *The Law of Admiralty* 48–51 (2d ed. 1975). Although the propriety of admiralty jurisdiction over a suit involving a marine insurance policy is unquestionable, *see Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961); *Wilburn Boat*, 348 U.S. at 313, 75 S.Ct. at 370; *Insurance Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 20 L.Ed. 90 (1870), the district court must employ the channel markers of *Wilburn Boat* to deduce whether federal admiralty law or state insurance law will control the litigation. The test requires the court to consider two questions: first, whether a judicially established federal admiralty rule governs the issue(s) presented; and second, if not, whether the court should create one. In the absence of a settled federal marine insurance rule, the *Wilburn Boat* inquiry

---

**17.** The focus of this opinion does not require the court to address the remainder of the defendant's arguments (some of which border on the metempirical). But, the surprising contrast to the facts presented by the plaintiffs at trial renders a partial recitation of interest. The defendant answers the plaintiffs' claims of lack of due diligence and breach of implied warranty of seaworthiness by outlining alleged arrangements made with Newcomb periodically to in-

spect and maintain the Flagstaff. The suggestion that such arrangements existed was apparently news to Newcomb. And, to rebut the plaintiffs' charges of scuttling, the defendant opines that a leak of unknown origin slowly put the Flagstaff lower in the water until the vessel subsided to the point where water flowed into the open sea chest. The defendant failed to identify any evidence that would even marginally support this thesis.

generally has been interpreted, in deference to state hegemony over insurance, to discourage the fashioning of new federal law and to favor the application of state law. *See, e.g., Continental Oil Co. v. Bonanza Corp.,* 677 F.2d 455, 461 (5th Cir. 1982); *Ahmed v. American Steamship Mutual Protection & Indemnity Association,* 640 F.2d 993, 996 (9th Cir.1981), *cert. denied,* —— U.S. ——, 104 S.Ct. 98, 78 L.Ed.2d 103 (1983); *Purofied Down Products Corp. v. Travelers Fire Insurance Co.,* 278 F.2d 439, 441 n. 1 (2d Cir.1960); *Granite State Minerals, Inc. v. American Insurance Co.,* 435 F.Supp. 159, 164 (D.Mass.1977).

It is at least arguable whether or not federal admiralty law should govern in this case. *Compare, e.g., Gulfstream Cargo, Ltd. v. Reliance Insurance Co.,* 409 F.2d 974, 981 (5th Cir.1969) (maritime law, not state law, said to control on the issue of concealment) (dictum) *with Fireman's Fund Insurance Co. v. Wilburn Boat Co.,* 300 F.2d 631 (5th Cir.1962) (Texas law applied to concealment and misrepresentation questions). As noted by the Fifth Circuit, however, the court, in the absence of significant differences between federal marine insurance principles and applicable state law, need not board the *Wilburn Boat. Continental Oil,* 677 F.2d at 461. This is such a case. An analysis of the controlling precedents demonstrates that federal admiralty precepts and those of New York are completely harmonious on the dispositive issues in the case at bar. *See, e.g., Navegacion Goya, S.A. v. Mutual Boiler & Machinery Insurance Co.,* 411 F.Supp. 929, 935 (S.D.N.Y.1975) (*Navegacion Goya II*) (marine insurance applicant's duty to disclose under federal maritime law is identical under New York law). *Compare, e.g., Btesh v. Royal Insurance Co.,* 49 F.2d 720 (2d Cir.1931) (citing only federal precedent), *with Scarburgh Co. v. American Manufacturers Mutual Insurance Co.,* 107 Misc.2d 772, 435 N.Y.S.2d 997 (1979), *aff'd,* 79 A.D.2d 942, 439 N.Y.S.2d 298 (1981) (New York law); *cf. Gulfstream Cargo,* 409 F.2d at 981. Therefore, the court draws sustenance from both.

## VI. *Keelhauling the Binder: Rescission*

 In the insurance context generally, "the relationship of the insured to the insurer is one in which entire good faith is of utmost importance." *Bouley v. Continental Casualty Co.,* 454 F.2d 85, 87 n. 3 (1st Cir.1972). *See,* to like effect, *Stipcich v. Metropolitan Life Insurance Co.,* 277 U.S. 311, 316, 48 S.Ct. 512, 513, 72 L.Ed. 895 (1928). And, an applicant for marine insurance assumes a much stricter duty than does one seeking, for example, casualty coverage. *Scarburgh,* 107 Misc.2d at 777–80, 435 N.Y.S.2d at 1000–02; 9 G. Couch, *Cyclopedia of Insurance Law* § 38:3 (2d ed. 1962). The marine insurance contract is *uberrima fides:* it is conceived in the uttermost good faith and incubated in a legal environment which transcends the sharper practices of the world of commerce. Either party's failure to observe that standard of conduct renders the contract voidable at the instance of the other party. *See generally* 2 J. Arnould, *Law of Marine Insurance and Average* (10 *British Shipping Laws*) § 549 (15th ed. 1961); L. Buglass, *Marine Insurance and General Average in the United States* 10–11 (2d ed. 1981).

 The doctrines of (i) misrepresentation and (ii) concealment (*nomen alienum* nondisclosure) occupy neighboring roles in the law governing the avoidance of marine insurance contracts. *See* 2 J. Arnould, *supra,* at § 551; L. Buglass, *supra,* at 23–27; G. Gilmore & C. Black, *supra,* at 62. The insured is bound, even absent inquiry, to reveal every fact within his knowledge which is material to the risk. *Stecker v. American Home Fire Assurance Co.,* 299 N.Y. 1, 6, 84 N.E.2d 797, 798–99 (1949). And, "[t]he obligation to disclose includes the duty not to misrepresent." *Morton v. Home Insurance Co.,* 299 N.Y.S.2d 642, 643, 32 A.D.2d 621, 621 (1969). Distortion of the factual underpinnings upon which the contract of marine insurance rests, fairly attributable to the insured, cedes to the insurer a right to rescind, irrespective of whether the warp is brought about by

knowing concealment of relevant facts or by outright misrepresentation. And, while both concealment and misrepresentation are perhaps more familiar as affirmative defenses raised by an insurer in response to a first-party action by an insured, the circumstance that these issues are presented here as affirmative claims in a declaratory judgment action is of no moment. The posture of the case does not impact the burden of proof: as to each theorem, the devoir of persuasion rests with the insurers. *Cf. Reliance Life Insurance Co. v. Burgess*, 112 F.2d 234 (8th Cir.), *cert. denied*, 311 U.S. 699, 61 S.Ct. 137, 85 L.Ed. 453 (1940).

Despite their conceptual overlap, these two grounds for rescission are bottomed on different factual predicates; and thus, each warrants independent consideration. In such an analysis, it readily appears that the plaintiffs have convincingly carried their burden on both aspects.

### A. Sailing Under False Colors: Misrepresentation

As previously mentioned, *see* Part II *ante*, there has been paraded upon the trial record a veritable cavalcade of willful misrepresentations which the defendant promulgated or caused to be advanced in the process of procuring coverage for the Flagstaff. Particularly, the defendant reported that a "Lloyd's survey" of the vessel had been performed; and that the Flagstaff had received rave reviews. The defendant also maintained, through that survey and by direct averments to the broker, that the vessel was in excellent condition and fully operable. Further, he avouched that he had two foreign buyers for the vessel, each willing to pay approximately $1,200,000; that the Flagstaff's replacement cost amounted to $9,000,000; and that her fair market value was on the order of $2,250,-000.

The plaintiffs are not required to prove malevolence.[18] If a policy of marine insurance is issued upon false and material representations, the absence of fraud or of an intent to deceive will not save the contract from rescission. *Wathen v. Public Fire Insurance Co.*, 61 F.2d 962, 964 (2d Cir.1932); 17 G. Couch, *supra*, at §§ 67:342–67:343. But, the misrepresentation must be material, that is, "it must be something which would have controlled the underwriter's decision," *Btesh*, 49 F.2d at 721, a circumstance which "would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk." L. Buglass, *supra*, at 24. And, whether or not a particular representation is material is a question of fact. 2 J. Arnould, *supra*, at § 578.

There is more than sufficient support in this record upon which to base a finding that Wisniewski's misrepresentations were constitutive. But for the string of misstatements uttered and-or sponsored by the defendant, the binder would not have been forthcoming. In this respect, the testimony of Peter Egan, a marine underwriter for Albany, was instructive. Egan impressed the court as experienced and knowledgeable, and left little doubt as to the salience of these representations. Indeed, the notion that expert testimony is essential in this egregious instance paints the lily: the mere suggestion that, had the truth been known, a prudent underwriter would have agreed to insure—for a million and a half dollars—a broken-down, scruffy, and largely unmarketable hulk with a fair market value of approximately $69,000 (and one which, in the most sanguine view, promised no profitable potential) is more than absurd; it is unfathomable[19]. The court finds, accordingly, that the binder in question issued as a direct consequence of

**18.** And, even were the law otherwise, Wisniewski plainly appears to have dealt with these insurers *sterilissima infidelitas;* and his motives can scarcely be characterized as anything short of iniquitous.

**19.** Like the argument advanced by the insured in *Bouley,* the suggestion that Albany and USF might reasonably have felt that Wisniewski's puffery was inconsequential approaches "the ultimate in absurdity." 454 F.2d at 87 n. 3.

the insured's misrepresentations of material fact.

### B. Foiled Again: Concealment

■ While misrepresentation alone is adequate to avoid coverage in the case at bar, rescission is equally available by reason of nondisclosure. The plaintiffs' contention is, in essence, that the defendant's failure to disclose the price paid for the Flagstaff constituted concealment of material fact. As noted *ante*, the law of marine insurance imposes a duty upon the insured to disclose voluntarily to the insurer, even though no inquiry is made, every material fact and circumstance within his knowledge and unknown (or fairly presumed to be unknown) to the insurer; and failure to do so—intentionally or otherwise—allows the insurer to have the contract declared void *ab initio*. *Gulfstream Cargo*, 409 F.2d at 980–81; *King v. Aetna*, 54 F.2d 253, 254 (2d Cir.1931); *Btesh*, 49 F.2d at 720; *Contractors Realty Co. v. Insurance Company of North America*, 469 F.Supp. 1287, 1294 (S.D.N.Y.1979); *Navegacion Goya II*, 411 F.Supp. at 935; *Anne Quinn Corp. v. American Manufacturers Mutual Insurance Co.*, 369 F.Supp. 1312, 1315 (S.D.N.Y. 1973), *aff'd mem.*, 505 F.2d 727 (2d Cir. 1974); *Stecker*, 299 N.Y. at 6, 84 N.E.2d at 798–99. *See generally* 2 J. Arnould, *supra*, at § 590; L. Buglass, *supra*, at 23–27; 9 G. Couch, *supra*, §§ 38:74–38:82; G. Gilmore & C. Black, *supra*, at 62. The question whether there has been concealment of a material circumstance is for the trier of fact. *King v. Aetna*, 54 F.2d at 255; 2 J. Arnould, *supra*, at § 637.

The plaintiffs rely heavily on *King v. Aetna*, *supra*, a venerable decision of the Court of Appeals for the Second Circuit which addressed a fact pattern akin to the Flagstaff situation. This court agrees that the reasoning of the *King* case is persuasive. *King* was an action on a marine insurance policy brought against the insurer to recover for the total loss of the steam yacht "Greyhound." The insurance company raised the issue of concealment. The insurance binder, prepared by a representative of the plaintiffs and presented to the underwriters, valued the yacht, which had been purchased for $2,500 two months prior to the loss, at $40,000, sixteen times the purchase price. The insurer neglected independently to investigate the value of the vessel, and the insured failed to disclose the purchase price.

After reviewing pertinent authorities, the court declared that any reasonable person should know that the fact that a vessel had been recently purchased for one-sixteenth of the value reported in the binder would be material to the decision of an underwriter considering issuance of a policy. *King v. Aetna*, 54 F.2d at 255. The court further stated:

> It is held that concealment of an overvaluation so excessive as to make the risk speculative vitiates the policy. The valuation of a vessel at sixteen times what she had just cost the insured likewise makes the risk speculative; the insured has less incentive to protect her than he would had he paid a sum some where near commensurate with the stated value.

*Id.* (citations omitted).[20] *See also Bella S.S. Co. v. Insurance Co. of North America*, 5 F.2d 570, 572 (4th Cir.1925) ("No reasonable insurer will knowingly take an insurance risk when it is to the interest of the insured that the property should be lost."); *Ionides v. Pender*, 9 L.R.–Q.B. 531,

---

**20.** The court is not unmindful of the decision of the District Court for the Southern District of New York in *Rosenthal v. Poland*, 337 F.Supp. 1161 (S.D.N.Y.1972), which distinguished *King* on its facts. *Rosenthal* is, however, readily differentiated from the matter at hand. In *Rosenthal*, as in both this case and the *King* case, the insured failed to disclose to the insurer the purchase price of the vessel. Rosenthal's craft, the steam ferryboat "Orange," was insured for more than thirty-three times that amount. Unlike the plaintiffs in *King* and the defendant herein, the plaintiff in *Rosenthal* had actually obtained "a fantastic bargain;" and the court therefore concluded that the purchase price was not a material fact. *Rosenthal*, 337 F.Supp. at 1169. Although the case at bar has many fantastic aspects, a bargain price is not among them.

538–39 (1874) (overvaluation so great as to make risk speculative is material to rational underwriters and therefore must be disclosed).

These tenets are on the mark here. The defendant, abetted by Kaltenbach, concocted a substantial overvaluation, and hid the true worth of the craft from the plaintiffs. Wisniewski's studied evasion of such a disclosure, as evidenced both in his dealings with A & P and in the omission from Kaltenbach's condition and value survey of any reference to the GSA auction or its results, shows beyond peradventure of doubt his recognition of the materiality of the datum and his determination not to advertise it. In consequence of the resultant cover-up, the Flagstaff was insured for more than twenty times her recent purchase price. This over-insurance, coupled with the fact that, absent an extremely sophisticated, expensive, and cost-ineffective effort to rehabilitate her, the vessel would remain a profitless piece of junk, certainly gave the insured no incentive to protect the Flagstaff—and every monetary reason to consign her to a watery grave. Such a perilous scenario constitutes precisely the kind of speculative risk that any prudent underwriter would abhor. And, given the full panoply of the facts, it cannot be gainsaid that the defendant was aware that, if Albany and USF learned of the purchase price or of the true value of the craft, the ball would be over.

The court finds that the defendant's failure to disclose the purchase price of the Flagstaff was tantamount to concealment of a material fact. And, it avails Wisniewski nothing to advert to the insurers' neglect to inquire about the vessel's cost. *E.g., King v. Aetna*, 54 F.2d at 254–55; *Stecker*, 299 N.Y. at 6, 84 N.E.2d at 798–99. Having costumed this extravagant aquatic masquerade, the defendant cannot so blithely shift the onus to those gulled by its pomp and pageantry.

### VII. *Red Sails in the Sunset*

As the sun so long ago set on the hulk of Grumman's failed endeavor, so it now sets on the shambles of Wisniewski's insurance scheme. Plaintiffs' case has been proven by clear and convincing evidence. The court concludes that the defendant knowingly and intentionally concealed and misrepresented essential facts when seeking coverage for the chase hydrofoil Flagstaff. The plaintiffs are, therefore, entitled to rescission of the binder, and to a declaration that the once and former insurance coverage was void *ab initio*, and is of no force or effect. So viewed, it is unnecessary for the court to consider or pass upon the plaintiffs' remaining grounds for avoidance of coverage and-or payment.

Counsel for the plaintiffs shall forthwith prepare and present for entry a form of Order and Judgment consonant with the findings and conclusions contained herein. Costs shall be taxed to the defendant.